707 A.2d 214

Stephen R. WOJDAK, Nicholas J. Maiale, Esquire, Personal Representative of Ludwig S. Capozzi, Jr., Deceased, Maurice C. Clifford, Patricia J. Clifford, Salvatore M. Debunda and Carol Debunda, Frank E. Devine, Teri Y. Doke, Domenic Falcone, Ruth W. Hayre, Samuel M. Merion, Martin D. Sellers, Dennis Sigovich, Appellants,

v.

GREATER PHILADELPHIA CABLEVISION, INC., General Partner of Greater Philadelphia Cablevision, L.P. and Greater Philadelphia Cablevision, L.P., Appellees.

Supreme Court of Pennsylvania.

Submitted March 11, 1997.

Decided Jan. 7, 1998.

Howard A. Rosenthal, John W. Pelino, James E. Miller, Philadelphia, Stephen R. Wojdak, Harrisburg, for Appellants.

Antoinette R. Stone, Philadelphia, for Greater Phila. Cablevision, Inc.

Before ZAPPALA, CAPPY, CASTILLE and NIGRO, JJ.

## OPINION

ZAPPALA, Justice.

The issue raised in this appeal is whether ex parte communications with third parties by an arbitrator constituted undue means and invalidated the arbitrator's award. Under the circumstances of this case, we find that the arbitrator's original award was invalid because of ex parte communications with third parties.

Greater Philadelphia Cablevision, L.P. (the Partnership) is a Delaware limited partnership which owns and operates a cable television system in Philadelphia. Greater Philadelphia Cablevision, Inc., a Pennsylvania corporation, is the general partner of the Partnership. The Appellants are a group of eleven of the twelve limited partners in the Partnership, who collectively owned 9.25% of the Partnership pursuant to a limited partnership agreement.

The limited partners and the general partner entered into the limited partnership agreement on February 11, 1988. The agreement included a "put and call" provision that gave the limited partners the right to require the Partnership to purchase portions of their individual interests (the put) during specified periods, and also gave the Partnership the right to require the limited partners to sell portions of their individual interests (the call) in those periods. In January 1992, the Appellants exercised their rights to put 50% of their interests to the Partnership.

The limited partnership agreement provided a mechanism for determining the fair market value of the individual interests of the limited partners in the event that the parties could not agree upon the price to be paid when there was a put or call.

The purchase price to be paid upon exercise of the Put or the Call for the Individual Interests being sold by the Special Limited Partners and Transferees shall be determined as follows. During the 30 days following selection of the Representative pursuant to Section 9.5(h), the Representative and the General Partner will attempt to agree on

the purchase price for the Individual Interests of the Special Limited Partners and Transferees being purchased and sold. If the Representative and the General Partner fail to agree on such a purchase price during such 30–day period, on the tenth day following expiration of such 30–day period, the Representative shall deliver to the General Partner a final aggregate dollar amount for which the Special Limited Partners and Transferees would be willing to sell their Individual Interests being purchased and sold against simultaneous delivery by the General Partner to the Representative of a final aggregate dollar amount for which it would be willing to purchase the Individual Interests of the Special Limited Partners and Transferees being purchased and sold. If the difference between the two amounts is equal to or less than 10% of the larger amount, the purchase price for the Individual Interests of the Special Limited Partners and Transferees being purchased and sold shall equal the average of the two proposed amounts. If the difference between the two amounts is greater than 10% of the larger amount, within 15 business days following such determination, the General Partner shall deliver to the Representative a list of nine investment banking firms or cable brokers of recognized national standing and experienced with cable television (such list not to include the principal investment banking firm of GMI or any of its Affiliates or any investment banking firm that has served within the three years immediately prior to the date of such delivery as lead manager or co-manager or placement agent in connection with a public or private offering of debt or equity securities of GMI or any of its Affiliates or any cable broker that has received a brokerage fee from GMI or any of its Affiliates in connection with the purchase or sale of a cable system within the three years immediately prior to the date of such delivery). Within 15 business days after receipt of such list by the Representative, the Representative shall select and deliver to the General Partner the names of three of the investment banking firms or cable brokers on such list. Within the 15 business days after receipt of such names by the General Partner, the General Partner shall select one of

the three investment banking firms or cable brokers named by the Representative who shall then be the appraiser. If the Special Limited Partners and Transferees fail to select a Representative by the March 31 of the year during which the Put or Call has been exercised, or if the Representative fails to select three names within 15 business days after his receipt of the list provided by the General Partner, the General Partner shall select three names from the list by lot. In determining the purchase price for purposes of the Put and Call, the appraiser shall determine the fair market value of the Individual Interests being Put or Called, as of the September 30 immediately preceding the initiation of the Put or Call, using whatever valuation techniques he deems appropriate. The General Partner and the Representative shall each be entitled to make a formal presentation to the appraiser and each shall cooperate fully with the appraiser. The Partnership, the General Partner and each Special Limited Partner and Transferee shall be finally bound by the decision of the appraiser. It is the intention of the parties that the appraisal shall be concluded within 60 days after the appointment of the appraiser. Each Partner agrees that neither it nor any of its Affiliates will retain the appraiser to act as lead manager or co-manager or placement agent in connection with a public or private offering of its debt or equity securities or to represent it in a purchase or sale of a cable system for a period of one year after completion of the appraisal, *provided* that nothing in this sentence shall prevent a Partner or any of its Affiliates from purchasing a cable system or property from, or selling a cable system or property to, any third party represented by such appraiser. (emphasis supplied.)

The provision was implemented in this case in May 1992 after the parties failed to reach an agreement on the value of the individual interests. In August 1992, the parties selected Waller Capital Corporation to determine the fair market value of the limited partners' interests. Waller Capital Corporation was retained pursuant to a fee agreement dated September 4, 1992.

The fee agreement stated the specific terms and conditions under which the valuation was to be conducted. Specifically, the agreement provided that

E. To promote fairness in the Valuation, Waller and each Party shall adhere to the following:

1. Copies of any written communications between Waller and a Party or representative of a Party, including all documents supplied to Waller, shall be contemporaneously forwarded to the other Party.

2. There shall be no ex parte proceedings *and* neither Party shall discuss the Valuation with Waller in the absence of the other Party. This policy shall not be interpreted to limit Waller's access to the cable system or its employees and officers. Both Parties shall receive notice of any meeting or telephone calls between representatives of the cable system and Waller and both Parties or their designees, shall be entitled to observe same or participate therein. (emphasis supplied.)

3. The Valuation shall be in writing and, with reasonable detail, set forth the assumptions made by Waller in performing the Valuation. On or before October 15, 1992, Waller shall forward a draft of such Valuation to both Parties. Within five (5) business days thereafter, either Party may forward written comments to Waller. On or before October 30, 1992, Waller shall produce the final Valuation.

The parties submitted financial data and other information to Waller in the next two months. An on-site visit to the cable television system was conducted by a Waller representative on September 18, 1992. On October 7, 1992, the parties made formal presentations to Waller. Andrew J. Armstrong, Jr., Waller's president, forwarded a draft of the appraisal of the fair market value of the limited partners' interest to the parties on October 15, 1992. The parties were given until October 23, 1992, to forward written comments on the valuation to Waller.

The draft appraisal indicated that the value of the put interests had been arrived at by, first, determining the gross value of the cable system as of September 30, 1991; second, determining the dollar amount of adjustments (primarily debt) to arrive at the total equity value of the cable system; third, calculating the gross equity of the individual interests based on the percentage of interests being put; and fourth, determining the amount of a discount to be applied to the gross equity value.[1]  In his letter, Armstrong addressed the matter of discounting the put interests:

A discount is appropriate because a buyer of the Interests (1) would be a minority, non-controlling partner with no voice in the management of the System and no voice in the decision to sell the System to a third party, (2) would have no liquid or efficient market in which to sell the Interests, and (3) would only be able to realize full value for his Interests upon (a) a sale of the System to a third party buyer, or (b) the termination of the Partnership in September 2015.

Our research into calculating the appropriate discount to be applied to the gross equity value of the Interests did not turn up any other directly comparable situations.  Instead, we looked at the secondary trading market of limited partnership units for cable systems and the pricing of cable stocks as of 9/91, insomuch as shares of publicly traded cable stocks trade in the secondary market at a significant discount to full private market value of the underlying cable

1.  A draft valuation summary set forth the following calculations used to arrive at the fair market value of the put interests:

VALUATION SUMMARY

(as of September 30, 1991)

| | |
|---|---:|
| Gross System Value | $140,143,510 |
| Less: Adjustments | (44,172,812) |
| Total System Equity | $ 95,970,698 |
| % Ownership of Individual Interests being Put by the Exercising Special Limited Partners | 4.625% |
| % Discount | 35.0% |
| Fair Market Value of Individual Interests being Put by the Exercising Special Limited ed Partners | $ 2,885,119 |

system assets. This research has led us to the conclusion that an appropriate discount to be applied to the gross equity value of the Individual Interests, as of 9/30/91, is 35.0%.

Both parties objected to the draft valuation. The limited partners objected to the application of the 35% discount; the general partner asserted that the gross value of the cable system had been overstated by a material amount. Waller rejected the parties' comments and issued a final valuation report on October 30, 1992. The report was virtually identical to the earlier draft. The report indicated that the fair market value of the put interests as of September 30, 1991, was either $2,885,119 (using the adjustments of the limited partners) or $2,646,956 (using the adjustments of the general partner).[2]

Armstrong addressed the parties' objections to the draft valuation report in a letter dated October 29, 1992, which accompanied the final valuation. As to the 35% discount, Armstrong explained that the discount "was chosen as appropriate after consulting with a variety of experienced cable television investors, researching the discounts to private market value of publicly traded cable stocks and reviewing other limited partnership documentation." The consultations with cable television investors referred to had not been disclosed in Armstrong's draft valuation.

On November 4, 1992, the limited partners filed a Petition to Confirm in Part and Vacate in Part Award in the Philadelphia County Court of Common Pleas. The limited partners objected to the part of the valuation by Waller that applied a discount to the value of the put interests and requested that the valuation be vacated to that extent, but otherwise confirmed. The limited partners asserted that the valuation had been procured by "undue means" in violation of the Delaware Uniform Arbitration Act, 10 Del.Code §§ 5701 et seq., because Waller had consulted with undisclosed cable television inves-

2. For purposes of this proceeding, the limited partners agreed to resolve the adjustments issue such that the lower figure of $2,646,956 shall be considered as the final valuation.

tors in gathering information concerning the valuation.[3] The general partner filed an answer and new matter to the petition asserting, inter alia, that Waller acted as an appraiser and not as an arbitrator and that Waller's conduct did not violate the Uniform Arbitration Act.

By memorandum order dated February 12, 1993, the common pleas court vacated the award and remanded for reconsideration of the value of the limited partners' interests without application of a minority discount. The court concluded that the valuation was procedurally deficient, finding that consultations with unknown and unidentified cable television investors on the issue of valuation of the limited partners' interests were inconsistent with the structured and open nature of the valuation process. The court determined that such conduct subsequent to scheduled consultations with the parties, and without notice, violated the Uniform Arbitration Act.

Pursuant to instructions by the common pleas court, the parties requested that Waller enter a final award removing the minority discount. Waller responded by letter dated April 15, 1994, indicating that the final award without the minority discount was $4,072,036. The general partner then filed a petition to vacate or modify the April 1994 appraisal, while the limited partners filed a petition to confirm the appraisal. On August 9, 1994, the common pleas court entered an order granting the limited partners' petition and denying the general partner's petition.

The general partner filed a notice of appeal to the Superior Court. On August 25, 1995, the Superior Court reversed the common pleas court and remanded the matter for confirmation of and entry of judgment on the final appraisal as originally submitted by Waller. The Superior Court concluded that the common pleas court had erred in refusing to confirm the appraisal and in directing that it be modified to remove the discount originally applied.

3. The limited partnership agreement executed by the parties specifically provided that the agreement is to be governed by the laws of the State of Delaware.

The limited partners filed a petition for allowance of appeal which was granted on June 18, 1996. After oral argument, a per curiam order was entered on November 8, 1996, stating that the Court being evenly divided, the order of the Superior Court was affirmed.[4] A petition for reargument filed by the limited partners was granted on January 23, 1997, and the parties were directed to submit the case on briefs. We have determined that the Superior Court erred in reversing the order of the common pleas court and now reverse for the following reasons.

The limited partners assert that the original award, which was based on the application of a minority discount, was procured by undue means in violation of the Uniform Arbitration Act. The limited partners argue that Waller's ex parte communications with undisclosed cable television investors constituted undue means as that phrase is used under the act. Furthermore, they contend that the ex parte communications violated the terms of the parties' arbitration agreement and the fee agreement with Waller.

Before the issue of whether ex parte communications with third parties by an arbitrator constitutes undue means under the act is addressed, we must discuss the standard of review to apply when assessing the valuation. The limited partners identify the valuation as an arbitration process rather than an appraisal. The general partner asserts that this characterization misconstrues the nature of the valuation so as to suggest, unfairly, that Waller's conduct should be tested under the more stringent rules that govern formal arbitrations. The general partner argues that the traditionally informal process of appraisals should be considered in construing the propriety of Waller's communications with other cable television investors.

In *Northeast Financial Corporation v. Insurance Company of North America,* 757 F.Supp. 381 (1991), a health club brought a breach of contract action against an insurance

---

**4.** The order further stated that Justice Zappala, Justice Cappy and Justice Nigro would reverse the Superior Court's order.

company which had issued a policy insuring the club against loss of income for temporary business interruptions resulting from fire damage. The lawsuit was filed after the parties reached an agreement on the total amount of lost income. The insurer then invoked the policy's appraisal procedures which allowed either party to demand an appraisal to settle the loss by written request. After the appraisal was completed, the health club filed a motion to vacate the appraisal award, asserting that the appraisal process was not intended to be final and binding upon the parties.

■ The United States District Court for the State of Delaware concluded that the appraisal provision was the equivalent of arbitration on the issue of the amount of damages. The court addressed the procedural distinctions between arbitration and appraisal recognized by the Delaware courts.

One distinction commonly drawn is that arbitration is typically conducted in a quasi-judicial proceeding with hearings, notice of hearings, oaths of witnesses and constitutes a final settlement of the dispute between the parties. Appraisal, on the other hand, is generally more informal in that the appraisers are not under oath, are not obliged to hear evidence and may proceed by ex parte investigation. In addition, appraisal extends only to a determination of actual cash value, all other issues being reserved for decision by a court.

757 F.Supp. at 383–84 (citations omitted). Thus, Delaware law focuses not on the formality of the proceedings, but on the binding effect of the valuation process to determine whether the proceeding is in the nature of an appraisal or arbitration.

■ We agree with Superior Court that "under Delaware law a binding determination by a third party appraiser is basically the equivalent of arbitration, and judicial review thereof is governed by the Delaware Arbitration Act...." In this case, the limited partnership agreement provided that "[t]he Partnership, the General Partner and each Special Limited Partner and Transferee shall be finally bound by the

decision of the appraiser" as to the valuation of the put interests. We conclude, therefore, that the valuation constituted an arbitration in the nature of an appraisal.

■ Judicial review of an arbitration award is limited under the act.

[I]n reviewing an arbitration award, a Court may not pass on the merits of claims submitted to an Arbitrator. 10 Del. C. § 5701. In considering an application to vacate an arbitration award, the Court is limited to a determination of whether there exists any of the five statutory grounds for vacating an award, as set forth in 10 Del. C. § 5714. If none of those grounds are found, and there is no pending motion to modify or correct the award, the Court must affirm the award.

*Malekzadeh v. Wyshock,* 611 A.2d 18 (Del.Ch.1992).

The statutory grounds for vacating an award include where:

(1) The award was procured by corruption, fraud or other undue means;

(2) There was evident partiality by an arbitrator appointed as a neutral except where the award was by confession, or corruption in any of the arbitrators or misconduct prejudicing the rights of any party;

(3) The arbitrators exceeded their powers, or so imperfectly executed them that a final and definite award upon the subject matter submitted was not made;

(4) The arbitrators refused to postpone the hearing upon sufficient cause being shown therefor, or refused to hear evidence material to the controversy, or otherwise so conducted the hearing, contrary to the provisions of § 5706, or failed to follow the procedures set forth in this chapter, so as to prejudice substantially the rights of a party, unless the party applying to vacate the award continued with the arbitration with notice of the defect and without objection; or

(5) There was no valid arbitration agreement, or the agreement to arbitrate had not been complied with, or the arbitrated claim was barred by limitation under § 5702(c),

and the issue was not adversely determined in proceedings under § 5703 and the party applying to vacate the award did not participate in the arbitration hearing without raising the objection. . . .

10 Del. C. § 5714(a).

■ The party challenging the award bears the burden of establishing specific grounds to vacate it. The limited partners assert that the award was procured by undue means insofar as the valuation reflected a minority discount because Waller independently consulted with cable television investors, without disclosing this fact, and relied upon those consultations in applying the 35% discount. The limited partners contend that the ex parte investigation violated the limited partnership agreement, the fee agreement and the Delaware act.

In the event that the parties were unable to agree on the purchase price for the put interests, the limited partnership agreement required the parties to submit aggregate dollar amounts for which the interests would be purchased or sold. If the difference between the two amounts was greater than 10% of the larger amount, the general partner was required to provide a list of nine investment banking firms or cable brokers of recognized national standing and cable television experience, with certain restrictions. Within fifteen business days after the receipt of the list, the representative of the put interests was to select three names from the list. From those three, the general partner would select an appraiser. The appraiser was permitted to use whatever valuation techniques were deemed appropriate in determining the fair market value of the put interests. The general partner and limited partners were entitled to make a formal presentation to the appraiser.

The established procedure was supplemented by the fee agreement with Waller. The fee agreement set forth specific provisions designed "[t]o promote fairness in the Valuation." The agreement stated, in relevant part, that "[t]here shall be no ex parte proceedings and neither Party shall discuss the Valuation with Waller in the absence of the other Party."

■ We must determine, therefore, whether Waller's ex parte contacts with cable television investors were prohibited by the terms of the arbitration and fee agreements, and whether the statutory phrase "undue means" encompasses such ex parte discussions. These issues involve questions of law. Our scope of review is plenary, as with any review of questions of law. *Simmons v. Pacor, Inc.*, 543 Pa. 664, 674 A.2d 232 (1996).

There has been no definitive statement by the Delaware courts as to the meaning of undue means as that phrase is used in the Uniform Arbitration Act. We are guided, however, by other jurisdictions which have interpreted similar statutory language or discussed ex parte contacts in the context of arbitration proceedings.

In *Shearson Hayden Stone, Inc. v. Liang*, 493 F.Supp. 104 (N.D.Ill.1980), aff'd, 653 F.2d 310 (7th Cir.1981), the plaintiff had terminated an employee whose position was terminable at will. Pursuant to an agreement requiring any employment controversy to be settled by arbitration, the matter was submitted to arbitrators who entered an award for the employee. The plaintiff sought to vacate the award asserting, inter alia, that the award was procured by undue means.

Under the applicable federal law, an arbitration award could be vacated where the award was procured by corruption, fraud or undue means. The plaintiff contended that the award should be vacated because there was no evidence regarding lack of good faith or cause or that the employment was not terminable at will. The court noted that other jurisdictions "appear[ed] to interpret 'undue means' in conjunction with terms 'corruption' and 'fraud' . . . and thus 'undue means' requires some type of bad faith in the procurement of the award." 493 F.Supp. at 108 (citations omitted). The court held that the award could not be vacated because the employer merely asserted undue means in the context of the evidence regarding good faith and the type of employment presented at the arbitration proceeding, without specific allegations that there was bad faith, fraud or corruption as to the evidence.

■ *Seither & Cherry Co. v. Illinois Bank Building Corporation,* 95 Ill.App.3d 191, 50 Ill.Dec. 672, 419 N.E.2d 940 (1981), involved an arbitration arising from the delayed completion of a construction project. The arbitration award was challenged on the basis that inadequate evidence was produced to support the claim for damages. The court refused to interpret "undue means" under the Illinois Uniform Arbitration Act so as to permit judicial review of the amount and the sufficiency of the evidence of damages, stating

> "[u]ndue means" goes beyond the mere inappropriate or inadequate nature of the evidence and refers to some aspect of the arbitrator's decision or decision-making process which was obtained in some manner which was unfair and beyond the normal process contemplated by the arbitration act.

95 Ill.App.3d at 197, 50 Ill.Dec. at 677, 419 N.E.2d at 945. See also, *Henley v. Economy Fire & Casualty Company,* 153 Ill.App.3d 66, 106 Ill.Dec. 300, 505 N.E.2d 1091 (1987) (procurement of arbitration award by undue means established where conferences took place with fewer than all of the arbitrators, plaintiff denied opportunity to present argument on pivotal issue, and arbitrators misrepresented unanimity of decision).

The Supreme Court of Arkansas adopted the interpretation of undue means articulated in *Seither* in its decision in *Arkansas Department of Parks and Tourism v. Resort Managers, Inc.,* 294 Ark. 255, 743 S.W.2d 389 (1988). Resort Managers, Inc. operated a lodge at a state park under a five-year lease. The parks department decided not to renew the lease because it was dissatisfied with the management of the lodge. The arbitration process was invoked to determine whether certain conditions of buildings resulted from normal wear and tear or from neglect or abuse by Resort Managers. The parks department submitted an itemized worksheet of replacement and repair costs associated with the lodge. No evidence was offered by Resort Managers. After touring the facility, the arbitrators awarded damages to the parks department.

Resort Managers challenged the award on the basis that the arbitrators were confused about which items needed to be

replaced and actual cleaning costs. It was claimed that the parks department had used undue means to obtain the award by misrepresenting its expenditures for carpeting, cleaning and painting the lodge. Applying the *Seither* definition of undue means, the court determined that Resort Managers had failed to establish sufficient grounds to vacate the award, although the arbitrators may have made some mistakes of fact. The court found that every objection raised on appeal could have been presented at the arbitration proceeding, but Resort Managers had done nothing.

> [T]he fact that the arbitrator [sic] made erroneous rulings during the hearing, or reached erroneous findings of fact from the evidence, is no ground for setting aside the award, because the parties have agreed that he should be the judge of the facts. Even his erroneous view of the law would be binding, for the parties have agreed to accept his view of the law. Were it otherwise in either of these cases, arbitration would fail of its chief purpose; instead of being a substitute for litigation, it would merely be the beginning of litigation.

294 Ark. at 261, 743 S.W.2d at 392.

The refusal of courts to extend the definition of undue means to challenges predicated upon a party's dissatisfaction with the results of an award is consistent with a public policy of encouraging arbitration. "Arbitration discourages litigation, permits parties to resolve their disputes in a specialized forum more likely to be conversant with the needs of the parties and the customs and usages of a specific industry than a court of general legal or equitable jurisdiction, and provides for speedy resolution of disputes in order that work may be completed without delay." *New Hampshire Insurance Company v. State Farm Insurance Company*, 643 A.2d 328, 330–31 (Del.Super.1993) (citation omitted).

Without specific guidance from the Delaware courts, we will adopt the interpretation of undue means articulated in *Seither* to promote consistency in the application of that term. We must determine next whether undue means encompasses ex parte consultations with third parties without notice to the parties.

In *Crosby–Ironton Federation of Teachers v. Independent School District No. 182,* 285 N.W.2d 667 (Minn.1979), the Minnesota Supreme Court interpreted undue means to include an arbitrator's ex parte contacts with a party. The court stated that "[a]ny case ... involving review of arbitration awards where ex parte contacts are made, orally or in writing, in regard to the issues under dispute, without notifying all other parties to the dispute, will raise a strong presumption that the ultimate award made was procured by corruption, fraud or other undue means...." 285 N.W.2d at 670. See also, *Sorren v. Kumble,* 578 So.2d 836 (Fla.Dist.Ct.App.1991) (per curiam opinion holding that undue means refers to such matters as ex parte communications between an arbitrator and one of the parties).

The courts have also demonstrated a willingness to vacate an award where the arbitrator has conducted an ex parte investigation. In *Stefano Berizzi Co., Inc. v. Krausz,* 239 N.Y. 315, 146 N.E. 436 (1925), the arbitration proceeding involved a dispute over alleged defects in a product's quality. After the hearings were closed, the arbitrator conducted his own investigation without notice to the parties by distributing samples of the product to others. The arbitrator based his award upon the information obtained through his personal investigation as well as the submitted testimony.

The court vacated the arbitration award, finding that the conduct of the arbitrator was misbehavior prejudicing the rights of the parties. The court reasoned that, without knowledge of the evidence, the parties had no opportunity to rebut or explain it. In the absence of authorization to proceed in his own way, the arbitrator's conduct constituted misbehavior. The court concluded that the absence of bad faith did not compel a different result as "misbehavior, though without taint of corruption or fraud, may be born of indiscretion." 146 N.E. at 437. See also, *Saffir v. Wilson,* 100 N.Y.S.2d 263 (1950) (arbitration award set aside because arbitrator had made independent investigation to confirm matters submitted to him without knowledge and consent of the parties to the proceeding).

The analysis in *Berizzi* was adopted by this Court in *Seaboard Surety Co. v. Commonwealth*, 350 Pa. 87, 38 A.2d 58 (1944). We held that the action of arbitrators in securing an independent report on a matter at issue constituted misconduct. A dispute arose from a contract for construction of a highway and bridge. The specifications included the results of test borings done for the State Highway Department that indicated an amount of subsoil described as blue clay and boulders. The construction company claimed that the description was false and constituted a misrepresentation by the department, as a result of which it suffered a financial loss. The parties submitted evidence to the Board of Arbitration regarding the existence or nonexistence of the blue clay. The board found in favor of the Commonwealth.

During the proceedings, the board failed to disclose that a separate ex parte investigation through a state geologist had been conducted. The geologist submitted a report to the board in which he concluded that blue clay was present in the subsoil. The construction company was unaware of the report until after the award had been made. We sustained the company's challenge to the award, stating:

It is clear that the action of the arbitrators in securing an independent report on a matter at issue constitutes misconduct within the meaning of the arbitration act. It cannot be seriously contended that [the company] was not injured as a result of the acts of the arbitrators. It was deprived of its right to cross-examine the state geologist and to adduce evidence to rebut his testimony.

350 Pa. at 92, 38 A.2d at 60. Furthermore, we emphasized that "[i]t is not essential that the arbitrators intentionally and fraudulently committed the acts complained of." *Id.*

We find that the action of the arbitrator in this case of engaging in an ex parte investigation of the fair market value of the put interests with third parties constituted undue means under the Delaware Uniform Arbitration Act. Unquestionably, the arbitrator's action was free of any taint of corruption or fraud, and was not undertaken in bad faith. Nevertheless, we find that the parties were not made aware of the arbitrator's

contacts with other cable television investors until after the initial draft of the award was circulated and the formal presentations had been made. As a result, the limited partners were deprived of their right to challenge the assumptions and opinions of the third party cable television investors upon whom the arbitrator relied in determining that a minority discount should be applied in valuing the put interests.

We are unpersuaded by the general partner's argument that the award was not procured by undue means because the arbitrator was retained to use its expertise in determining the fair market value of the put interests, and was not confined to evidence or testimony or to the factual record made by the parties. There is a fundamental difference between an arbitrator relying upon its own professional experience and an arbitrator seeking the professional input of third parties. Moreover, while it is accurate to say that this arbitration proceeding did not employ all of the formalities of calling and conducting an examination of witnesses, it is not accurate to say that the parties contemplated an unfettered process in which information obtained from third parties on critical issues would not be disclosed to the parties.

To the contrary, the limited partnership agreement required the arbitrator to prepare a draft appraisal and to hear presentations by the parties before the final award was issued, and the fee agreement provided that the number of witnesses or experts called during the hearing of the formal presentation was at the discretion of the presenting party. Clearly, the purpose of these provisions was to allow the parties to respond to the information considered and the preliminary conclusions reached by the arbitrator. The parties did not anticipate that relevant information would be withheld from them prior to the final valuation.

We conclude, therefore, that the Superior Court erred in reversing the judgment of the common pleas court. Accordingly, the order of the Superior Court is reversed and the order of the common pleas court is reinstated.[5]

5. The general partner asserts that should this Court sustain the common pleas court's ruling, the matter should be remanded for a rehear-

SAYLOR, J., did not participate in the consideration or decision of this matter.

FLAHERTY, C.J., and NEWMAN, J., did not participate in the decision of this matter.

CASTILLE, J., concurs in the result.

ing as to the entire valuation before a new arbitrator. Since it is undisputed that the arbitrator relied upon the ex parte investigation in connection with the minority discount portion of the award, we find no abuse of discretion by the common pleas court in vacating that part of the award and confirming the remainder of the award.