**Doina PANEA and John Panea, Husband and Wife, Appellants (at 3677),**

v.

**Neil ISDANER, M.D., Neil Isdaner, M.D., P.C., and Jeanes Hospital, Appellees.**

**Shirley L. Bell and Thomas P. Bell, her Husband, Appellees,**

v.

**Joseph A. Slezak, M.D., Joseph A. Slezak, M.D. Ltd., L. Alan Egleston, M.D. and Frick Community Health Center.**

**Appeal of Joseph A. Slezak, M.D. and Joseph A. Slezak, M.D. Ltd. (at 2174)**

**Robert Baker, Appellant (at 642),**

v.

**Donald Myers, M.D., Sanford Davne, M.D., and Acromed. Corporation, Appellees.**

Superior Court of Pennsylvania.

Argued April 17, 2000.

Filed April 10, 2001.

---

**12.** I do find it relevant that both *Kline* and *Boron Oil* were published prior to the enactment of the Statutory Construction Act of 1972, 1 Pa.C.S. §§ 1501–1991, which requires us to construe statutes liberally to give effect to their purpose and to promote justice.

I find it particularly relevant considering, "[c]ourts have construed municipal enabling statutes both strictly and liberally. A strict construction, limiting municipal power to its express provisions, favors the individual landowner. A liberal construction, making it easier to imply a power not expressly made, favors the municipality." Hostettler, *Naylor v. Township of Hellam: The Validity of Moratoria on Land Development Under the Pennsylvania Constitution*, 8 Widener J. Pub.L. 733, 738 (1999).

Barbara Axelred, Philadelphia, for Panea, appellants.

Kathleen Smith–Delach, Washington, for Slezak, appellant.

Jeffrey S. Kahn, Plymouth Meeting, for Baker, appellant.

Mark Zolfaghari, Blue Bell, for Isdaner and Davne, appellees.

Gregory Castelli, Pittsburgh, for Egleston, appellee.

Howard F. Messer, Pittsburgh, for Bell, appellees.

Daniel F. Ryan, Plymouth Meeting, for Myers, appellee.

Before McEWEN, President Judge, Del SOLE, HUDOCK, EAKIN, JOYCE, STEVENS, MUSMANNO, ORIE MELVIN and TODD, JJ.

ORIE MELVIN, J.:

¶ 1 The instant appeals present common questions concerning the proper application of § 991.1817(a), the non-duplication of recovery provision of the Pennsylvania Property and Casualty Insurance Guaranty Association Act (the Act). 40 P.S. §§ 991.1801–1820.[1] In the first two cases the parties reached a settlement prior to trial, and the defendants' insurer was subsequently ordered into liquidation before the settlement funds were disbursed. In the third case the defendants' insurer was ordered into liquidation and following a jury verdict in favor of the plaintiff an offset was granted on motions for post-trial relief. The relevant facts of each case shall be set forth briefly.

### PANEA v. ISDANER, M.D., No. 3677 Philadelphia, 1998

¶ 2 In this appeal, the Paneas instituted a civil action alleging medical malpractice against Neil Isdaner, M.D. and Neil Isdaner, M.D., P.C. (the Isdaner defendants). Ultimately the parties reached a settlement agreement wherein the Isdaner defendants agreed to pay $75,000.00. On December 23, 1997, a release was executed by the Paneas discharging the Isdaner defendants and their insurer, the Physicians Insurance Company (PIC) from further liability. On January 21, 1998, prior to payment of any of the settlement funds, the Commonwealth Court of Pennsylvania ordered PIC into liquidation due to its insolvency.[2] The Pennsylvania Property and Casualty Insurance Guaranty Association (PPCIGA) stepped in as successor to PIC, the insolvent insurer. See 40 P.S. § 991.1803. After determining the Paneas received $9,422.00 in benefits under their health insurance coverage, PPCIGA

claimed an offset of this sum pursuant to § 991.1817(a) of the Act. The Paneas were paid the balance of the settlement amount totaling $ 65,578.00. On September 25, 1998, the Paneas filed a Petition to Enforce Settlement, and PPCIGA moved to intervene. On November 10, 1998, the Honorable Mark I. Bernstein entered an Order denying the Petition to Enforce Settlement, and thus the motion to intervene was deemed moot. Judge Bernstein determined the Act unambiguously permitted the offset and Dr. Isdaner was not personally liable for the amount of the offset. This timely appeal followed.

### BELL V. SLEZAK, M.D., No. 2174 Pittsburgh, 1998

¶ 3 In this case the Bells instituted a medical malpractice action against Dr. Joseph A. Slezak and his professional corporation, Dr. L. Alan Egleston among others, alleging negligence in failing to diagnose Mrs. Bell's mechanical bowel obstruction. After court supervised settlement negotiations, on January 15, 1998, the parties reached an agreement wherein the Bells would receive the sum of $200,000.00 from Dr. Slezak, representing his policy limits, and $300,000.00 from the Pennsylvania Medical Professional Liability Catastrophe Loss Fund (CAT Fund) to the extent the fund was liable for payments on behalf of both doctors. Counsel for Dr. Slezak sent a settlement agreement to counsel for the Bells. The Bells executed and returned the document. Shortly thereafter and before the insurer made any disbursement of funds, Dr. Slezak's insurance carrier, PIC, was declared insolvent and was placed in liquidation by the Commonwealth Court. Pursuant to the Act, PPCIGA assumed the

---

1. By order dated January 14, 2000, we directed that these three appeals be listed consecutively for argument before the Court en banc.

2. See M. Diane Koken v. PIC Insurance Group Inc., 44 M.D.1998 (filed 1/21/98 Pa.Cmwlth.).

position of PIC as primary insurer to Dr. Slezak and his professional association.

¶ 4 PPCIGA refused to pay the $200,000.00, claiming that under 40 P.S. § 991.1817(a) it was entitled to an offset for any medical expenses paid by the Bells' health insurance. Since the Bells' health insurer had paid in excess of $200,000.00 to Mrs. Bell, PPCIGA claimed it was entitled to a complete offset of the amount Dr. Slezak agreed to pay. The Bells filed a petition to enforce the settlement agreement. This appeal followed the trial court's conclusion that the offset provision did not apply in this case and that the agreement was enforceable as written.

### BAKER V. MYERS, M.D., No. 642 EDA 1999

¶ 5 This medical malpractice action was instituted in March of 1990; Baker sued Drs. Donald L. Myers and Sanford Davne, alleging they were negligent in the performance of spinal fusion surgery and each had failed to obtain Baker's informed consent. Baker's Complaint alleged Drs. Myers and Davne had failed to advise him of the new and experimental nature of the bone plates and screws used in the surgery, and thus, they had not obtained Baker's informed consent to the surgical procedures. On December 1, 1995, the first trial ended with the trial court granting a nonsuit in favor of Myers and Davne. Baker appealed, and this Court vacated the trial court's judgment entered in Myers' and Davne's favor and remanded the case for a new trial. Following remand, on November 18, 1998, the jury returned a verdict finding Myers and Davne liable on Baker's informed consent claim and awarded Baker $47,500.00 in damages. However the trial court determined Myers was the sole party responsible for obtaining Baker's informed consent, and therefore, the trial court molded the verdict to reflect that determination.

Baker filed a petition for delay damages, and the trial court awarded him an additional $18,162.91, resulting in a total judgment of $65,662.91 against Myers.

¶ 6 In January 1998, PIC, Myers' insurer, became insolvent and the Commonwealth Court of Pennsylvania placed PIC in liquidation. Consequently, Myers' defense was assumed by PPCIGA. After the jury's verdict, Myers filed post-trial motions, wherein he asserted entitlement to the setoff provided by the Act. The trial court agreed and determined that Baker had recovered benefits from other insurance, including workers' compensation benefits and medical costs for several subsequent surgeries, in an amount exceeding the amount of the judgment entered against Myers. Consequently, the trial court applied the offset provision of the Act and molded the verdict to zero in light of the insurance payments made on Baker's behalf. The trial court further held Baker could not enforce the judgment directly against Myers. This timely appeal followed.

¶ 7 The common questions presented by the cases of Panea, Bell and Baker may be restated as follows:

(1) Should a settlement agreement, which remains unpaid at the time a tortfeasor's insurer becomes insolvent, be fully enforceable without regard to the offset provision of 40 P.S. § 991.1817(a), or must the settlement be molded to recognize the statutory offset?

(2) Should the offset provision of 40 P.S. § 991.1817(a) be applied to a cause of action that accrued prior to its effective date?

(3) If the offset is available to the PPCIGA, should it also preclude personal liability of the insureds for payment of the offset amount?

Additionally, the Baker case asks us to decide:

(1) Whether a Plaintiff who obtains a jury verdict for damages is entitled to the entry of judgment on the verdict, notwithstanding any right of setoff which may ultimately be asserted by PPCIGA?

(2) Even if applicable, whether a defendant who defends against a claim should be estopped from asserting the statutory offset?

(3) Whether PPCIGA's statutory setoff extends to payments by other insurance that have not been proven to be related to defendant's culpable conduct?

(4) Whether the trial court erred in molding the verdict in favor of Dr. Davne based upon its finding that only Dr. Myers was responsible for obtaining Baker's informed consent?

■ ¶ 8 Initially, we note our scope of review of a trial court's construction of a statute is plenary. *Wojdak v. Greater Phila. Cablevision, Inc.*, 550 Pa. 474, 707 A.2d 214 (1998). Further, as this matter involves only questions of law, our standard of review is limited to determining whether the trial court committed an error of law. *Stone & Edwards Ins. v. Commonwealth, Dep't of Ins.*, 538 Pa. 276, 281 n. 2, 648 A.2d 304, 307 n. 2 (1994). When interpreting a statute, a court must attempt to ascertain the intent of the Legislature, which can only be derived by reading all sections of the statute together and in conjunction with each other and construed with reference to the entire statute. *Housing Auth. of County of Chester v. Pennsylvania State Civil Service Com'n*, 556 Pa. 621, 730 A.2d 935 (1999). The legislative intent behind the statute's enactment controls its meaning and application. *United Cerebral Palsy v. W.C.A.B.*, 543 Pa. 544, 673 A.2d 882 (1996).

¶ 9 At issue here is the applicability of the so-called offset provision of the Act entitled "Non-duplication of recovery," which provides:

Any person having a claim under an insurance policy shall be required to exhaust first his right under such policy. For purposes of this section, a claim under an insurance policy shall include a claim under any kind of insurance, whether it is a first-party or third-party claim, and shall include, without limitation, accident and health insurance, worker's compensation, Blue Cross and Blue Shield and all other coverages except for policies of an insolvent insurer. *Any amount payable on a covered claim under this act shall be reduced by the amount of any recovery under other insurance* .

40 P.S. § 991.1817(a) (emphasis added). A "covered claim" is defined, in pertinent part, at 40 P.S. § 991.1802 as:

(1) An unpaid claim, including one for unearned premiums, submitted by a claimant, which arises out of and is within the coverage and is subject to the applicable limits of an insurance policy to which this article applies issued by an insurer if such insurer becomes an insolvent insurer after the effective date of this article and:

(i) the claimant or insured is a resident of this Commonwealth at the time of the insured event . . . .

■ ¶ 10 The Paneas and Bells first assert the Act should not be applied to settlements reached prior to insolvency because its application was not within the contemplation of the parties. Specifically, they argue the source of payment under the settlement agreement was not specified and not made contingent upon solvency. Consequently, application of the Act violates basic contract law principles,

which preclude reformation of the parties' agreement in the absence of any showing of fraud, accident or mutual mistake. We are not persuaded by this argument.

¶ 11 This argument asks us to ignore the economic realities of litigation and the interplay of insurance coverage in the settlement process. No one disputes the fact that the settlement agreements established the defendants' liability; however, to the extent the defendants' liability is covered by insurance the insurer is ultimately obligated to pay. It cannot logically be denied that all the parties anticipated that insurance would cover payment of the settlement amounts. The defendants all paid premiums for their malpractice insurance and expected to have coverage in the event of a claim. Thus, the defendant doctors are also victims of the insurers' insolvency. In recognition of the harm occasioned by insurance companies becoming insolvent the legislature saw fit to fashion a remedy by enacting this Act. The provisions of the Act are triggered when "an order of liquidation with a finding of insolvency" is entered against an insurer after the effective date of the Act. *See* 40 P.S. § 991.1802 (definition of insolvent insurer). Consequently, if this triggering event occurs before the now insolvent insurer has met its obligation to indemnify the insured's loss, the insured and any third party claiming through the insured has a potential claim under the Act. The Paneas' and Bells' assertion that application of the Act represents a reformation of their contract is misplaced. None of the parties have asked for reformation, or for that matter recission, of the contract.[3] Rather, defendants are merely asserting a statutory right to either limit or extinguish their obligations to pay on the claims. The

fact of whether the defendants' liability is liquidated or unliquidated at the time of the Act's application is of no moment. The key determinant of whether or not the claim is covered under the Act is whether the liability remains unpaid at the time the Act is triggered. *See supra*, 40 P.S. § 991.1802 (definition of covered claim).

¶ 12 Reference to the Statutory Construction Act illustrates a statutory remedy is favored over the common law. Specifically, 1 Pa.C.S.A. § 1504 provides:

> In all cases where a remedy is provided or a duty is enjoined or anything is directed to be done by any statute, the directions of the statute shall be strictly pursued, and no penalty shall be inflicted, or anything done agreeably to the common law, in such cases, further than shall be necessary for carrying such statute into effect.

The courts of this Commonwealth have consistently held that "[w]here a remedy is provided by an act of assembly, the directions of the legislation must be strictly pursued and such remedy is exclusive." *Lurie v. Republican Alliance*, 412 Pa. 61, 63, 192 A.2d 367, 369 (1963). *See also Harcourt v. General Accident Ins. Co.*, 419 Pa.Super. 155, 615 A.2d 71 (1992), *appeal denied*, 534 Pa. 648, 627 A.2d 179 (1993) (same). The instant Act provides a clear and adequate remedy for a loss due to the insolvency of a property and casualty insurer. Some of the Act's stated purposes are: "[t]o provide a means for the payment of covered claims under certain property and casualty insurance policies, to avoid excessive delay in the payment of such claims and **to avoid financial loss to claimants or policyholders** as a result of

---

**3.** Since the initial settlements were negotiated before PPCIGA became involved, neither party contemplated a reduction of the settlement amount by statutory set-off. However, while this may be a basis to rescind the settlement, the Appellants have chosen not to do so.

the insolvency of an insurer." 40 P.S. § 991.1801(1) (emphasis added).

■ ¶ 13 The Act clearly attempts to protect both policyholders and those with claims against policyholders from the consequences of the insolvency of the insurer by establishing an association, the sole purpose of which is to compensate those who have claims which have not been paid because the insurance company is insolvent. The association is funded by assessing a fee against all member insurers, and every insurer is required to be a member as a condition of its authority to write property and casualty policies. 40 P.S. §§ 991.1803(a), (b)(3), and 991.1808. In this manner, the risk of loss due to the insolvency of any one insurer is spread out over all member insurance companies and their policyholders. *Id.* at § 991.1810. In effect, every time PPCIGA pays a claim, every member insurance company is paying part of the claim. The Act therefore seeks to lessen the financial burden on the insurance industry by preventing duplication of recovery. As Justice Zappala stated in reference to the prior version of the instant non-duplication provision: "This provision reflects the legislature's intent that fiscally solvent insurers, which are contractually obligated to pay a claim, be the primary source of payment." *Bethea v. Forbes,* 519 Pa. 422, 428, 548 A.2d 1215, 1218 (1988). Given the legislative intent of this statutory scheme, we find the plaintiffs' entitlement to the disbursement of settlement funds is not controlled by common law contract principles. Rather, to the extent there was insurance coverage, the right to payment constitutes nothing more than a claim against an insolvent insurer by virtue of having a claim against a tortfeasor who was insured by that insurer. Furthermore, a plaintiff who has a claim under the defendants' insurance policy, which remains unpaid at the time of insolvency, is considered as having a "covered claim" under § 991.1802 (defining covered claim), and thus falls within the parameters of § 991.1817 (Non-duplication of recovery).

■ ¶ 14 Next, the Paneas also argue the current version of the "Non-duplication of recovery" provision is inapplicable because it was enacted after their cause of action accrued. We disagree. The original version of the Act was created in 1970, under the name Pennsylvania Insurance Guaranty Association (PIGA). *See* Pennsylvania Insurance Guaranty Association Act, 40 P.S. §§ 1701.101–603. The current version repealed and replaced the 1970 Act and became effective as of February 10, 1995.[4] The Paneas assert their cause of action accrued on December 3, 1993, and therefore the prior version of the act must be applied. However, the time of the underlying injury upon which suit is brought is not the determinative event. As previously stated, the provisions of the Act only become applicable upon an order of liquidation with a finding that an insurer is insolvent after the effective date of the Act. Here, PIC was declared insolvent and ordered into liquidation on January 21, 1998, clearly after the effective date of the current version of the Act. Hence, the Paneas' reliance upon cases interpreting the repealed legislation is misplaced, as these cases are no longer controlling. *See McCarthy v. Bainbridge,* 739 A.2d 200, 201 n. 2 (Pa.Super.1999) (stating "[t]he fact that appellees' cause of action arose prior to [the effective date of the Act] is irrelevant and does not exempt appellees from the applicability of the amended statute.").

---

4. Act of December 12, 1994, P.L. 1005, No. 137, § 1, effective February 10, 1995, as amended by the Act of December 21, 1995, No. 79, § 15, effective February 19, 1996, 40 P.S. §§ 991.1801–1820.

¶ 15 We are next presented with the question of whether in light of the application of § 991.1817(a) the insured of the insolvent insurer may be held personally responsible for the amounts offset. We find the legislative intent of the Act precludes such an anomalous result. The plaintiffs argue that if the insureds are not personally liable then the plaintiffs will bear the loss, and as between an innocent victim and a tortfeasor the risk of loss should be placed on the tortfeasor. Despite the facial appeal of the argument, a closer examination of how the Act serves to spread the loss belies the plaintiffs' contention. In fact it is not the plaintiffs who bear the loss, rather, if any loss can be said to have occurred, it is the solvent insurers who paid plaintiffs' claims under the other sources of insurance, which the Act requires to be exhausted first. In each of the three cases under consideration the plaintiffs will receive the full amount of either their settlements or jury verdict, it just will not necessarily come from PPCIGA or the doctors.

¶ 16 For example in the case of the Paneas, the settlement amount was $75,000.00. PPCIGA offset $9,422.00, which was paid by the Paneas' health insurance carrier and paid the Paneas the balance of $65,578.00. The health insurance carrier cannot assert a subrogation claim against the Paneas for the $9,422.00 because by application of the Act's non-duplication of recovery provision the Paneas never received that sum under the settlement. As subrogee, the Paneas' health insurance carrier has no greater rights than those held by the Paneas. *See Allstate Ins. Co. v. Clarke,* 364 Pa.Super. 196, 527 A.2d 1021, 1024 (1987) (stating "as subrogee stands in the precise position of the subrogor the subrogee should be limited to recovering in subrogation the amount received by the subrogor *relative* to the claim paid by the subrogee .... "). It is well established that subrogation is an equitable doctrine involving the right of legal substitution and may take place with or without contractual agreement between the parties. *Kaiser v. Old Republic Ins. Co.,* 741 A.2d 748, 754 (Pa.Super.1999). "It is granted as a means of placing the ultimate burden of a debt upon the one who in good conscience ought to pay it, and is generally applicable when one pays out of his own funds a debt or obligation that is primarily payable from the funds of another." *Id.* (citations omitted). Since the Paneas are precluded from recovering by application of the non-duplication of recovery provision, they have not recovered relative to the claim paid by the subrogee; therefore, the health insurer cannot recover from the Paneas.

¶ 17 Nor can the health insurance carrier recover that sum from PPCIGA because such a claim does not constitute a covered claim pursuant to the Act. *See* 40 P.S. § 991.1802, (definition of "covered claim"), at (2) (stating: "The term shall not include any amount ... due any reinsurer, insurer, insurance pool or underwriting association as subrogation recoveries or otherwise."), *see also, American States Ins. Co. v. State Auto Ins. Co.,* 721 A.2d 56, 62 (Pa.Super.1998) (interpreting the similarly worded definition of the predecessor statute, 40 P.S. § 1701.103(5)(b), as prohibiting a claim of an insurer against PIGA for equitable subrogation). Any other result would subvert the intention of the non-duplication of recovery provision of § 991.1817(a). Contrast this scenario with what would have occurred if PIC had remained solvent. The Paneas would have received the entire $75,000.00 from PIC; however, this recovery would have been subject to the health insurer's subrogation rights reducing their recovery to $65,578.00. Consequently, by application

of the Act the Paneas are in the same position they would have been in had there been no insolvency. This same scenario holds true for the Bells and Mr. Baker. To find the doctors personally liable for the offset amount would contravene one of the stated purposes of the Act, which is "to avoid financial loss to ... policyholders as a result of the insolvency of an insurer." 40 P.S. § 991.1801(1).

¶ 18 Our decision today is consonant with our holding in *Burke v. Valley Lines, Inc.*, 421 Pa.Super. 362, 617 A.2d 1335 (1992), wherein we recognized that to impose such a financial loss directly on the insured tortfeasor would clearly contravene the purpose of the predecessor Act (PIGA). In *Burke*, the plaintiff was injured in a motor vehicle accident. The defendants' insurer was declared insolvent, and PIGA assumed the defense and coverage obligations. Prior to trial the plaintiff settled with his uninsured motorist carrier for $85,000.00 even though the available coverage was $200,000.00. A jury returned a verdict of $400,000.00 in favor of the plaintiff. Plaintiff was also found 50% negligent; thus the verdict was molded to $200,000.00. The defendants' filed post-trial motions, wherein they asserted the plaintiff was not entitled to recover from them because he had settled his UM claim for less than the policy limits and the molded damages were less than PIGA's liability limit. The trial court agreed and molded the verdict in light of the plaintiff's failure to exhaust his rights under the policy.

¶ 19 Under the predecessor version[5] of the instant non-duplication of recovery provision, this Court held the plaintiff was precluded from recovering from PIGA based on his failure to exhaust other insurance available to him, and plaintiff could not recover the offset amount from the defendants. In concluding the tortfeasor also could invoke the protection of the offset provision, we noted the purpose of the Act was to protect people who had paid for insurance but who did not have the protection for which they paid due to their insurer's insolvency. Our Court reasoned as follows:

> Given PIGA's release from all financial responsibility as a direct result of appellant's failure to exhaust his uninsured policy rights, we hold that appellant is likewise barred from recovering from appellees. Any other holding would render the 'exhaustion' provision of the Insurance Guaranty Act meaningless ....
>
> If appellees were now personally responsible for appellant's damages award, they would be without any source of insurance to bridge the gap between appellant's uninsured motorist settlement of $85,000 and the $200,000 award .... To expose appellees to such a financial loss (which is a direct result of appellant's failure to exhaust his rights under his uninsured motorist policy) would violate the very purpose of PIGA—to avoid 'financial loss to ... policyholders as a result of the insolvency of an insurer.' Protection of appellees from financial loss can only be accomplished by barring appellant's right of recovery against them.

*Id.* at 1338–39 (citations omitted). We further opined that "PIGA was designed to provide claimants with a recovery equal to the insolvent insurer's policy limits (or PIGA's liability cap) less whatever amount the claimant may have recovered by *exhausting* his rights under any other policy of insurance." *Id.* at 1338. We are not here presented with a situation where the

---

5. 40 P.S. § 1701.503(a).

settlement or jury damage award exceeds the insolvent insurer's policy limits or PPCIGA's liability cap.[6] Thus, we will not address the question of whether a defendant can be held personally liable for the amount exceeding the policy limits or statutory cap.[7]

¶ 20 We next turn to the additional questions presented in the Baker appeal. Mr. Baker first contends he is entitled to the entry of judgment against both defendants with delay damages and to seek satisfaction of that judgment from any available source at his discretion. He argues his right to a judgment is unrelated to any potential offset provided by the Act. We disagree. For the reasons previously expressed with respect to settlements, we find the non-duplication of recovery provision applies with equal vigor to a jury verdict and may be applied in post-trial proceedings to mold the verdict.

¶ 21 As previously discussed, Mr. Baker is a claimant by virtue of his third party claim under the PIC policy. The Act does not present a claimant with a choice of whether to pursue the insured's personal assets or claim the statutory benefits. Under the Act, PPCIGA has a duty to pay covered claims. 40 P.S. § 991.1803(b)(1)(i). We see no reason why fulfillment of this duty cannot be accomplished in post verdict proceedings. Post-verdict proceedings present a timely, orderly and efficient manner for resolution of any entitlement to the offset. It is at this point in time that the plaintiff's damages have been established, and the amount payable on a covered claim should be known. If the amount paid by other insurance has not been established or admitted, a short evidentiary hearing can readily determine the necessary facts. Mr. Baker offers no authority that prohibits insurance related considerations in post-trial motions. In fact insurance issues are commonly involved in post-trial motions to add delay damages pursuant to Pa.R.C.P. 238. *See Miller v. Hellman*, 433 Pa.Super. 539, 641 A.2d 592 (1994), *appeal denied*, 540 Pa. 601, 655 A.2d 990 (1995) (stating "[this Court] will decide whether the insurance carrier will be liable for delay damages on a case by case basis.").

¶ 22 Once a verdict is returned finding liability and establishing damages, the defendants and PPCIGA at that point, provided the Act has been triggered by the insurer's insolvency, are certainly aware that application of the offset provision would affect the amount of the verdict. Accordingly, we find the timely filing of post-trial motions asserting the statutory offset is an appropriate method to assure that the trial court still has jurisdiction to act.[8]

¶ 23 Mr. Baker next argues that Dr. Myers should be estopped from asserting a setoff because he defended against the claim. We find nothing in the Act prevents a defendant from asserting a defense. Furthermore, section 991.1803(b)(2) provides PPCIGA with all of the "rights, duties, and obligations of the insolvent insurer." One of the rights PIC had was to provide a defense on behalf of Dr. Myers; therefore, it follows that

---

6. § 991.1803(b)(1)(i)(B) of the Act caps PPCIGA's liability at $300,000.00 per claimant.

7. The *Burke* panel in *obiter dictum* expressed the view that the plaintiff could recover any excess amount directly from the defendant. *See Burke, supra*, at 1339 fn. 5.

8. This, of course, is not to suggest that PPCIGA would be precluded from asserting its entitlement to the offset after the judgment is final. Rather, since the offset operates to partially or completely satisfy PPCIGA's obligation, it may be raised at any time from verdict to execution on the judgment.

PPCIGA may also provide a defense on behalf of Dr. Myers. As a practical matter if Dr. Myers successfully defends and is not fastened with liability then Mr. Baker has no claim to assert, and the Act is not implicated. Accordingly, we find no merit to this contention.

¶ 24 Mr. Baker next questions whether PPCIGA's right to a setoff is only available for payments of other insurance for the damages resulting from the culpable conduct giving rise to liability on the part of the insured. A panel of this Court has answered this question in the affirmative. In *McCarthy v. Bainbridge*, 739 A.2d 200 (Pa.Super.1999), *appeal granted*, 563 Pa. 647, 758 A.2d 1200 (2000), this Court was asked to decide whether § 991.1817(a) permitted PPCIGA to offset amounts received by a claimant under a life insurance policy against the amount due under the agreement settling the malpractice action. The panel concluded that it did not and reasoned as follows:

> The only reasonable reading of the offset provision is to require that the claim to be offset must be for the same loss as the claim asserted against PIC. In other words, the claim must be under insurance that sought to protect the insured against the same risk as was covered by the now insolvent insurer for whom PIGA is providing coverage. That is not the situation with which we are presented in this case. Here, the medical malpractice insurance provided by the now insolvent insurer was casualty insurance, which is generally defined as:
>
> > That type of insurance that is primarily concerned with losses caused by injuries to persons and legal liability imposed upon the insured for such injury or for damage to the property of others.
>
> Black's Law Dictionary, at 721 (5th ed.1979).

In contrast, life insurance is generally defined as:

> A contract between the holder of a policy and an insurance company (i.e., the carrier) whereby the company agrees, in return for premium payments, to pay a specified sum (i.e., the face value or maturity value of the policy) to the designated beneficiary upon the death of the insured.

> That kind of insurance in which the risk contemplated is the death of a particular person.

*Id.* at 723.

> As these rudimentary definitions indicate, life insurance and medical malpractice liability casualty insurance are fundamentally different, most notably because they insure against different risks and protect against different types of loss. Life insurance provides a defined benefit payable upon death, whether accidental or from natural causes, to designated beneficiaries. Medical malpractice liability insurance provides coverage for amounts the insured (i.e., the doctor) is held legally liable to pay others because of the doctor's own negligence and the harm it caused.

*McCarthy*, at 203. To the extent *McCarthy* stands for the proposition that the loss must be attributable to culpable conduct of a third party and the "other insurance" is paying the loss in its capacity of a secondary obligor, we concur with this rationale.

¶ 25 In *Daley–Sand v. West American Ins. Co.*, 387 Pa.Super. 630, 564 A.2d 965 (1989), this Court explained the interplay between subrogation and insurance as follows:

> When an insurer [Blue Cross] pays a claim under a policy, it is actually paying the debt of the tortfeasor [Defendants]. The insurer is only secondarily liable; it

is the tortfeasor who is primarily liable. Once the insurer has paid a claim to the insured [Plaintiffs], it may then stand in the shoes of the insured and assert the insured's rights against the tortfeasor. The right to stand in the insured's shoes and to collect from the tortfeasor once it has paid the insured an amount representing the tortfeasor's debt is called the insurer's right to subrogation.

*Id.* at 969. In contrast, when a life insurance company pays the beneficiary the proceeds under a life policy those proceeds do not represent a tortfeasor's debt. Rather, the proceeds represent the life insurance company's primary obligation under the contract. Accordingly, a life insurance carrier does not obtain any right to subrogate against the recovery in the malpractice action by virtue of its paying a claim pursuant to the life insurance policy. This is true because the life insurance carrier was not caused to make its payment due to a third party's negligence; rather, it was solely obligated to pay due to the happening of an event (death), regardless of fault. Conversely, when an employer seeks subrogation under the Workers' Compensation Act, or for that matter a health insurance carrier, recovery is dependant upon establishing that it was caused to make its payments due to the negligence of a third party. *Dale Manufacturing Co. v. Bressi,* 491 Pa. 493, 421 A.2d 653 (1980). Consequently, it cannot be said that the failure to offset where the payment consists of life insurance proceeds results in a duplicative recovery.

¶ 26 Given this holding we now turn to the facts presented in Baker to determine whether the asserted offsets were caused to be paid due to the culpable conduct of the tortfeasor. Here, a verdict was returned awarding Baker $47,500.00, and the trial court included an additional $18,162.91 in delay damages. The Honorable Victor J. DiNubile, Jr. then molded the verdict to zero by applying the offset provision on the basis that "it is without dispute that [Baker] received insurance benefits both under [Workers'] Compensation and for certain surgeries which far exceeded the amount of the judgment entered in this case ...." Trial Court Opinion, 2/9/99, at 3. Baker asserts the offset was improper because the other insurance payments would have been made regardless of the fault of Dr. Myers. He notes that his back injuries predated any intervention by the defendants and therefore argues his workers' compensation carrier was obligated to pay regardless of any intervening tortious conduct by third parties. Baker's argument would be correct if the offsets being asserted included insurance payments for prior injuries whether in the form of medical expenses or indemnity benefits. However, the record reflects Baker sought recovery for the medical expenses associated with his second, third and fourth surgeries in an amount totaling approximately $71,000.00.[9] These damages were in deed alleged to have resulted from the defendants' tortious conduct in failing to obtain Mr. Baker's informed consent. Consequently, the trial court did not err in molding the verdict to zero in light of the fact the other insurance payments were made for medical expenses incurred as the result of the defendants' culpable conduct, and these payments alone exceeded the damages awarded notwithstanding the indemnity benefits also paid by the workers' compensation carrier.

9. Specifically, in the post-trial motion to mold the verdict defense counsel averred that NorthBrook Insurance Company paid $67,611.21 for Mr. Baker's second and third surgeries and Allstate Insurance Company paid $3,472.90 for the fourth surgery and related treatment. Defense counsel further requested an evidentiary hearing if these asserted payments were contested. Mr. Baker did not deny these payments were made.

¶ 27 Finally, Baker contends the trial court erred in molding the verdict in favor of Dr. Davne based upon its finding that only Dr. Myers was responsible for obtaining his informed consent. Baker argues Dr. Davne's delegation of the duty to obtain informed consent to another physician does not absolve him of liability should the required information not be conveyed. We agree.

¶ 28 Under Pennsylvania law, if a physician fails to obtain a patient's informed consent for a surgery that he performs, that doctor is liable for any injuries resulting from the surgery, regardless of whether the physician was negligent. *Foflygen v. R. Zemel,* 420 Pa.Super. 18, 615 A.2d 1345, 1352–1353 (1992), *appeal denied,* 535 Pa. 619, 629 A.2d 1380 (1993); *see also, Morgan v. MacPhail,* 550 Pa. 202, 704 A.2d 617 (1997) (holding physician must obtain informed consent from patient before performing surgical or operative procedure). The validity of the informed consent is dependent upon the pretreatment information relayed regardless of whether the disclosures were made by the treating physician or another qualified person. *Foflygen v. Allegheny General Hospital,* 723 A.2d 705 (Pa.Super.1999), *appeal denied,* 559 Pa. 705, 740 A.2d 233 (1999); *see also, Boutte v. Seitchik,* 719 A.2d 319 (Pa.Super.1998) (holding surgeon who only performed reconstructive surgery following patient's mastectomy liable for obtaining informed consent where procedures were inextricably intertwined). Instantly, the jury determined that Drs. Myers and Davne did not obtain Baker's informed consent before performing the surgery. Dr. Davne performed the surgery and, therefore, had a duty to ensure that Baker gave his informed consent to that surgery. The trial court erroneously altered the verdict to hold only Dr. Myers responsible for obtaining Baker's informed consent.

Accordingly, we reverse the order molding the jury verdict to .hold only Dr. Myers responsible for obtaining Baker's informed consent and the jury verdict against both defendants should be reinstated. Nonetheless, since Dr. Davne was also insured by PIC the offset provision is equally applicable to Dr. Davne's liability, and a molded verdict of zero should properly be entered as to both defendants.

¶ 29 In summation, as to the case of *Panea v. Isdaner, M.D.,* No. 3677 Philadelphia 1998, we affirm the trial court's application of § 991.1817(a) and the Order denying the Paneas' petition to enforce settlement. In the case of *Bell v. Slezak, M.D,.* No. 2174 Pittsburgh 1998, we reverse the Order enforcing the settlement. In *Baker v. Myers, M.D.,* No. 642 EDA 1999, we affirm in part the judgment entered on the verdict molded to reflect the applicable offset provided by § 991.1817(a) of the Act as to Dr. Myers and reverse the Order molding the verdict to absolve Dr. Davne from liability.

¶ 30 Del SOLE, J., joins and files a Concurring Statement.

¶ 31 McEWEN, President Judge, files a Concurring and Dissenting Statement.

¶ 32 TODD, J. files a Dissenting Opinion.

¶ 33 MUSMANNO, J., joins J.E02005–00 (642 EDA 1999) Opinion of ORIE MELVIN, J. but joins the Dissenting Opinion of TODD, J. on J.E02004–00 (2174 PGH 1998) and E02003–00 (3677 PHL 1998).

DEL SOLE, J., concurring.

¶ 1 I join the Majority opinion of Judge Orie Melvin but write separately to address the concerns raised by my colleague Judge Todd in her dissent.

¶ 2 Because in my view the Pennsylvania Property and Casualty Insurance Guaran-

ty Act was designed to balance the equities between an injured claimant and an insured whose carrier becomes insolvent, I agree with the Majority's holding that the remedy for a claimant faced with a reduction in payment following settlement is to rescind the settlement once PPCIGA seeks a setoff. Majority Opinion at 789, fn. 3.

¶ 3 The dissent correctly suggests that where a claimant has negotiated a compromise or waiver of subrogated interests, the claimant's anticipated economic benefit from the original settlement would be reduced if PPCIGA were permitted to offset the sum of the subrogated interests from the settlement amount. However, providing a claimant with the ability to rescind the settlement in these circumstances alleviates this concern.

¶ 4 Also, when an insurer offers to settle within its policy limits on behalf of its insured, I cannot conclude that the insured would, or should, insist on language in the agreement which restricts the source of the payment to the insurer's funds. Even in certain professional liability policies where an insured must approve settlement terms, the reality is that settlements within policy limits are assumed to be the responsibility of the insurer. To suggest an insured must insist on language limiting the source of payment to the insurer's funds would, I believe, place an unnecessary burden on the insured. Further, to permit recovery of a settlement sum from an insured where the insurer becomes insolvent following settlement, but before payment, frustrates one of the purposes of the Act.

McEWEN, President Judge, concurring and dissenting.

¶ 1 I hasten to join in the results achieved by the perceptive analysis pre-sented in the dissenting opinions in *Panea* and *Bell,* since I agree that these cases must be resolved through application of settled principles of contract law. At the same time, I join in the able and discerning majority opinion of Judge Orie Melvin in *Baker* insofar as (1) it calls for application of the statutory set-off accorded PIGA, (2) it finds that judgment n.o.v. was improperly entered in favor of Dr. Davne and, (3) it concludes that the defendants are entitled to the benefit of any set-off to which PIGA is entitled. However, since the set-off to which PIGA is entitled is limited to those sums received from insurance proceeds which cover the same type of loss as was later claimed against Dr. Myers, *McCarthy v. Bainbridge,* 739 A.2d 200, 203 (Pa.Super.1999), *appeal granted,* 563 Pa. 647, 758 A.2d 1200 (2000) I would remand *Baker* to the trial court for a hearing on the issue of the amount of the set-off to which PIGA is entitled.

TODD, J., dissenting.

¶ 1 I respectfully dissent. The Majority concludes in the Panea and Bell cases that application of the non-duplication of recovery provision of the Pennsylvania Property and Casualty Insurance Guaranty Association Act ("the Act")[10] does not violate basic contract law principles. (Majority Opinion, at 788.) Similarly, in the Baker case, the Majority implicitly concludes that molding the verdict to reflect the offset is not an improper interference with a lawfully-rendered jury verdict. As I disagree with each of these conclusions, I must dissent.

¶ 2 The Paneas agreed to resolve their claims against Dr. Isdaner in return for a settlement in the amount of $75,000. The

10. 40 P.S. §§ 991.1801–1820.

release which was intended to memorialize this agreement apparently was drafted by Dr. Isdaner's counsel and submitted to the Paneas' counsel for their signature. It contains neither a contingency provision regarding, nor any discussion of, the source of those funds. The release does contain an integration provision stating that the written document represents "the complete release agreement." Although PIC, as the physician's insurer, was named in the release, among numerous others including Dr. Isdaner's counsel, PIC was not a party to the action.

¶ 3 Similarly, the Bells settled with Dr. Slezak and the CAT fund in return for a total payment of $500,000, with $200,000 to be paid by Dr. Slezak and $300,000 to be paid by the CAT fund.[11] The joint tortfeasor release executed by the Bells contains an integration clause providing, "it is further understood and agreed that there are no written or oral understanding [sic] or agreements, directly or indirectly, connected with this release and settlement, that are not incorporated herein." (Bell Release, ¶ 9, R.85a). Aside from setting forth the apportionment of settlement funds between Dr. Slezak and the CAT fund, the release is silent as to the ultimate source of the funds to be paid. The only contingency in the Bell release referred to court approval, if required. PIC was not a party to the action and was not mentioned specifically within the release.

¶ 4 It is axiomatic that settlement agreements are contracts between the parties and are to be enforced under general contract law principles, absent fraud, accident or mutual mistake. *Clark v. Philadelphia College of Osteopathic Medicine,* 693 A.2d 202, 207 (Pa.Super.1997). Fundamental among those principles "is the directive that 'the effect of a release must be determined from the ordinary meaning of its language.'" *Id.* (quoting *Buttermore v. Aliquippa Hospital,* 522 Pa. 325, 328–29, 561 A.2d 733, 735 (1989)).

¶ 5 In these cases, a review of each releases' plain language reveals nothing regarding the source of the funds to be paid by the physicians. Nor does it contain any contingency based on insurance coverage. Moreover, there has been no allegation that any contingency regarding the source of the funds to pay the defendant physicians' obligations was a part of the explicit agreement between the parties and was intended by the parties to be included in the release. Thus, there are no claims of fraud, accident or mutual mistake in these cases.

¶ 6 The Majority reasons that "defendants are merely asserting a statutory right to either limit or extinguish their obligations to pay on the claims." (Majority Opinion, at 789.) If there is such a statutory right, however, it is held not by the defendant physicians, but by the Pennsylvania Property and Casualty Insurance Guaranty Association ("PPCIGA") and, as noted above, neither PIC nor PPCIGA was a party to either of these actions or settlements.

¶ 7 The Majority concludes that despite the presence of an integration clause, we must find an unwritten term of the settlement agreement, i.e., the parties' mutual understanding that insurance coverage for the amount to be paid by the physician necessarily was contemplated by the parties. (Majority Opinion, at 789.) I acknowledge that plaintiffs below may have been aware the physicians had insurance coverage, and may even have known the

---

**11.** While Dr. Slezak argues in his brief that the release was not signed until after PIC was declared insolvent, it is clear that the parties reached a settlement agreement prior to the declaration of insolvency. (See Brief for Appellant Slezak, at 5.)

limits of that coverage. However, I do not agree that we may therefore conclude that these plaintiffs considered that the insurer's failure to pay would result in the deduction of any shortage from their settlement receipts. Nor can I conclude that these plaintiffs considered that any such payments were not the ultimate responsibility of the defendant physician who was a party to the agreement. Thus, whatever the defendant physicians' unilateral expectations regarding payment by their insurer, there simply is no evidence that any such understanding was part of the mutual agreement between the parties to these settlement agreements. Instead, I believe it is more reasonable to conclude the injured plaintiffs understood they would receive the full amount of the physician's share of the settlement whether paid directly by him or by an insurer on his behalf. Had the physicians wished to make these settlements contingent upon full payment by their insurer, they certainly could have done so. They did not.

¶ 8 In his thorough and well-reasoned Opinion in the Bell case, the Honorable Gary P. Caruso concluded:

[I]t is beyond reason to ask the Court to ignore the fact that both parties, at the time the settlement was negotiated, were aware that [Dr.] Slezak was insured and that the primary limits payable by the insurer was $200,000.00. However, even with this awareness, neither party made reference to the requirement that $200,000.00 of the $500,000.00 settlement amount was to be paid by Slezak's now insolvent insurer and further it did not provide that Slezak would be relieved of his/its obligation if the insurer became insolvent before payment was made.

(Bell Trial Court Opinion, 5–6.) Judge Caruso went on to explain:

The factual pattern here is that both the plaintiffs and the defendant, Slezak, were, at the time of arriving at the settlement agreement, represented by attorneys experienced in medical malpractice cases. Certainly each counsel understood that, under present law, before the C.A.T. fund would participate in any settlement, the physician must promise to pay the first $200,000.00 of the settlement amount. The plaintiffs' counsel was successful in extracting from defense counsel Slezak's promise to pay $200,000.00. This was the primary limit of Slezak's insurance policy. Certainly, Slezak fully intended that the amount he promised to pay would be paid by his insurer and would not be his personal responsibility. However, this was not the concern of the plaintiffs. Their only concern was to receive an offer of payment of $200,000.00 in order to look to the C.A.T. fund for additional monies. *Their concern was not the source of the $200,000.00 but only the promise of its payment.*

(*Id.* at 7 (emphasis added)).

¶ 9 The Majority dismisses the assertion by the Paneas and the Bells that application of the offset against their settlement proceeds represents an improper reformation of their settlement agreements by stating that neither party has sought to reform or to rescind the agreements. (Majority Opinion, at 789.) In my view, the Paneas and Bells fulfilled their obligations under the settlement agreements and then, understandably, desired and sought enforcement of their agreements by their terms. If there was a basis in law for reformation or recission,[12] the onus was on

---

**12.** I express no opinion as to whether these remedies may be appropriate in these cases.

However, as the Bells point out, instead of seeking such a remedy, Dr. Slezak has relied

the defendant physicians, the parties who sought to avoid their obligations after agreement had been reached and the injured plaintiffs had fulfilled their obligations thereunder, to seek such a remedy. In the absence of reformation or rescission, I believe the physician defendants remain liable for the full amount of the settlements they agreed to pay to the injured plaintiffs. I would, therefore, reverse the Order of the Philadelphia County Court of Common Pleas which denied Appellants/Plaintiffs Paneas' Petition to Enforce settlement against Defendants/Appellees' Neil Isdaner, M.D. and Neil Isdaner, M.D., P.C., and affirm the Order of the Westmoreland County Court of Common Pleas which granted Appellees/Plaintiffs Bells' Petition to Enforce Settlement against Appellants/Defendants Joseph A. Slezak, M.D. and Joseph A. Slezak, M.D., Ltd.

¶ 10 With respect to the Baker case, I similarly would conclude that Robert Baker is entitled to enforce a judgment against Donald Myers, M.D. for the full amount of the jury's verdict, and I would reverse the Order of the Philadelphia Court of Common Pleas which molded the jury verdict in favor of Baker and against Dr. Myers in the amount of $65,662.91 (including delay damages) to zero. Baker's right to recover against Dr. Myers was adjudicated at trial by a jury which rendered a verdict based upon the evidence presented. Nei-

ther PIC nor PPCIGA was a party to this action. I believe that it represents an unprecedented and unwarranted intrusion by the judiciary to inquire into a defendant's expectations regarding possible insurance coverage to satisfy a judgment and to mold a verdict accordingly if expected funds are not forthcoming.

¶ 11 In sum, contrary to the holding of the Majority, I would find that in each of these three cases, the injured plaintiffs should receive the full amount of their settlement or judgment against the defendant physicians.

¶ 12 The Majority, in Judge Orie Melvin's exhaustive Opinion, holds that the Act mandates that amounts already received by the injured plaintiffs as health insurance benefits be deducted from the amount to be paid by PPCIGA. The Majority's conclusion prevails because in its view, these plaintiffs must be viewed as "claimants" under the Act.[13] I cannot agree with the Majority's conclusion that "[t]he instant Act provides a clear and adequate remedy for a loss due to the insolvency of a property and casualty insurer." (Majority Opinion, at 789.) I further disagree with the Majority's implicit conclusion that as between the policyholder and an injured plaintiff, the Act mandates that any loss be borne by the plaintiff.

upon the validity of the settlement in subsequent court filings and otherwise acted as though the settlement agreement remains valid and enforceable in all other respects. (Brief for Appellees Bell, at 16.)

13. The Majority assumes that plaintiffs below are to be deemed claimants under the Act. To the contrary, the record does not reveal that the injured plaintiffs made any claim for payment directly to PPCIGA. Instead, they have brought actions against the defendant physicians who sought defense and indemnity coverage from their now-insolvent insurer,

PIC. As discussed above, neither the insurer nor PPCIGA was a party to any of these actions. As noted by Judge Caruso in the Bell case, the term "claimant" is not defined. These plaintiffs did not have any contractual relationship with PIC, nor any basis upon which they could have made a claim against PIC. Their only cause of action exists against the tortfeasor. Thus, the plaintiffs may not even be the type of claimant referred to in the Act and to which the Act's purpose would apply.

¶ 13 As noted by the Majority, one of the Act's stated purposes is "to avoid financial loss to claimants or policyholders as a result of the insolvency of an insurer." 40 P.S. § 991.1801(1) (emphasis added). The so-called offset provision of the Act, entitled "Non-duplication of recovery," provides, *inter alia,* "[a]ny amount payable on a covered claim under this act shall be reduced by the amount of any recovery under other insurance." 40 P.S. § 991.1817(a). Strict application of the Act, mandating the Majority's rejection of the injured plaintiffs' claims on appeal, thus requires us to act in contravention of one of the Act's stated purposes because in so doing we are, in effect, ignoring the goal of "avoid[ing] financial loss to claimants...." Certainly, under the Majority's analysis, we are fulfilling part of the Act's purpose, for the application of its statutory terms results in the "avoid[ance] [of] financial loss to ... policyholders," i.e., the physicians. Despite entering into legally binding settlement agreements with the injured plaintiffs, due to the insolvency of their insurer, the defendant physicians are now "off the hook" for the amounts to which they agreed.

¶ 14 The Majority also concludes that applying a set-off in the amount of received health insurance has no effect on the actual proceeds of the settlement to be realized by the injured plaintiffs because the settlement proceeds otherwise would be subject to the health insurer's subrogation lien. With this conclusion, I must disagree. In the Panea and Bell cases, settlements were negotiated prior to PIC's insolvency. We do not know whether in reaching the agreed upon settlement amounts, counsel was successful in obtaining compromises or even waivers of subrogation interests, or whether such a compromise or waiver might be reached in the future, thus dramatically impacting the net amounts these plaintiffs actually were to receive under the settlement agreements. Indeed, the entire statutory offset amount may have been waived, thus leading plaintiffs to have anticipated receiving the entire settlement amount with no subrogation to follow.[14] As discussed above, the Majority acknowledges there may have been a basis to rescind the settlement, perhaps alluding to the possibility of a compromised or waived subrogation lien, but that plaintiffs below chose not to do so. Again, the Majority's application of the Act results in our placing the burden on plaintiffs below to seek to enforce a settlement with the now inherent risk of statutory setoff or forego the settlement and begin anew their efforts to obtain a recovery directly from the doctors.

¶ 15 Under the Majority's analysis, application of the Act pursuant to its terms requires us to penalize one of the parties it purports to protect, i.e., claimants.[15] Surely the Act was not intended to immunize policyholders, in these cases physicians, completely from any personal liability. However, through the Act's application by our Court today, such immunity has been achieved. As between an injured victim and a tortfeasor, when only one is to suffer a financial penalty, I do not believe this result to be the proper one. We have long recognized, "as between two innocent parties ... liability should be borne by the

---

**14.** Likewise, we cannot rule out the possibility that such subrogation could be asserted against settlement proceeds other than those at issue here.

**15.** I am assuming for purposes of this analysis the Majority is correct that the injured plaintiffs are to be viewed as claimants.

one ... who made the loss possible." *Triffin v. Dillabough,* 448 Pa.Super. 72, 670 A.2d 684, 693 (1996) (citation omitted), *aff'd* 552 Pa. 550, 716 A.2d 605 (1998). *Accord Rothman v. Fillette,* 503 Pa. 259, 469 A.2d 543 (1983); *Rykaczewski v. Kerry Homes, Inc.,* 192 Pa.Super. 461, 161 A.2d 924 (1960). It is not sound public policy to make the victim of negligent conduct pay for the tortfeasor's unfortunate choice of insurance carrier.[16] I believe the public policy of this Commonwealth supports the conclusion that the risk of loss caused by the physicians' insurance company be borne by the physicians, not by the injured victims of their negligence.

¶ 16 Finally, I note that the result reached by the Majority may lead to absurd results, as plaintiffs who suffer more serious physical injuries, and who therefore receive more extensive medical treatment and thus greater medical insurance benefits, may ultimately receive less cash compensation from their agreed upon settlements with the physicians than plaintiffs with less severe physical injuries. This is an anomalous result that could not have been intended by the legislature.

¶ 17 For these additional reasons, I respectfully dissent.

¶ 18 As the Majority has concluded that the result reached by it today is the one required under the Act, I urge the legislature to revisit the mandates of the Act in light of its stated purposes and the long-standing public policy of this Commonwealth.

---

**16.** Indeed, the result reached by the Majority encourages the choice of the cheapest possible premium without regard to an insurance company's financial soundness since, in the event of a claim, the insured retains the savings in premiums and passes the loss to PPCI-GA and the injured party.