Bertram SCHMIDT, Petitioner,

v.

WORKERS' COMPENSATION AP-
PEAL BOARD (PEPSI COLA COM-
PANY and Kemper Insurance Compa-
ny), Respondents.

Commonwealth Court of Pennsylvania.

Submitted on Briefs July 11, 2003.
Decided Nov. 17, 2003.

George R. Szymanski, Philadelphia, for petitioner.

Jack T. Ribble, Jr., Philadelphia, for respondent.

BEFORE: COLINS, President Judge, LEAVITT, Judge, and KELLEY, Senior Judge.

OPINION BY Judge LEAVITT.

Bertram Schmidt (Claimant) petitions for review of the Workers' Compensation Appeal Board's (Board) adjudication granting the suspension-modification petition filed by Pepsi Cola Company (Employer). The Board held that Employer was entitled to subrogation against Claimant's tort recovery from third parties for his injuries. Further, it reduced Claimant's claim for the costs of his litigation, thereby increasing the net subrogation amount owed to Employer. In doing so, the Board affirmed the remand decision of the Workers' Compensation Judge (WCJ). We affirm the Board.

On May 24, 1989, Claimant, who was employed as a route salesman/deliveryman, was injured while unloading cases of soda from his truck. He fell from a receiving platform at a food market in Philadelphia. Claimant was severely and permanently injured, and he began receiving workers' compensation benefits. As of May 6, 1999, Claimant had received wage loss and medical benefits in the amount of $176,091.28.[1]

Claimant instituted a lawsuit against four entities whose negligence was alleged to cause his injury. In the course of the litigation, the insurance company for the primary defendant became insolvent, and the insurer's obligation to the tortfeasor was assumed by the Pennsylvania Insurance Guaranty Association (PIGA).[2] Prior to trial, claimant settled his claims with three of the four defendants. Claimant agreed to accept $299,900 from PIGA and $107,400 from the other parties.[3] The claims against the fourth defendant, the landlord of the building, eventually went to trial, but the jury rendered a verdict in favor of the landlord.

On February 8, 1996, Employer filed a suspension-modification petition seeking subrogation against Claimant's settlements. Claimant opposed Employer's subrogation claim. Claimant asserted that employer's subrogation rights against the $299,900 PIGA were abrogated by the PIGA Act. On March 2, 2000, the WCJ denied subrogation against the PIGA payment (the $299,900), granted subrogation against the other parties' payments (the $107,400) and permitted all costs of Claimant's litigation to be used to calculate the net subrogation amount due Employer. This litigation included Claimant's unsuccessful lawsuit against the landlord as well as his successful settlements with other tortfeasors.[4]

1. It is not clear how this breaks down between medical and wage loss benefits. As of January 10, 1997, the parties stipulated that medical expenses had totaled $31,389.89.

2. PIGA was established by the Act of November 25, 1970, P.L. 716, *as amended,* 40 P.S. §§ 1701.101–1701.605 (PIGA Act), to provide coverage, consistent with the statutory limits and conditions, to policyholders of insolvent insurers and third-party claimants. The PIGA Act was repealed in 1994 and replaced by Sections 1801 to 1820 of The Insurance Company Law of 1921, Act of May 17, 1921, P.L. 682, *as amended,* added by the Act of December 12, 1994, P.L. 1005, 40 P.S. §§ 991.1801–991.1820 (1994 Act).

3. The sum of $100,000 was obtained from the Cigna Insurance Company on behalf of William F. Miller and Son Trash Removal, Inc.; the sum of $299,900 was obtained from PIGA on behalf of Ziggy's Market, Inc.; the sum of $7,400 was contributed by Richard Mancini, individually, as principal of Ziggy's Market.

4. Claimant brought an action under the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213, against Employer. Claimant's attorneys withheld $3,000 from the tort settlement amount for the cost of litigating the ADA claim. The Board held that the ADA claim was not relevant to the tort settlement and, therefore, not subject to proration. The record does not explain the outcome of the ADA claim.

Employer appealed to the Board. The Board found that the WCJ erred in denying Employer subrogation against the PIGA payment. The Board also found that under the proration requirements in Section 319 of the Workers' Compensation Act,[5] Claimant's costs in litigating the unsuccessful action against the landlord should not have been considered in calculating the net subrogation amount owed to Employer. Accordingly, the Board remanded the case to the WCJ for a recalculation of the net subrogation amount. On March 25, 2002, the WCJ issued its remand decision. Claimant appealed, but the Board re-affirmed its February 6, 2001 order and the WCJ's remand decision. Claimant then petitioned for this Court's review.

On appeal, Claimant raises two issues. First, Claimant contends that Employer and its insurer were not entitled to subrogation against the amount he received from PIGA as a matter of statutory law and sound public policy. Second, Claimant asserts that all litigation costs incurred, whether successful or unsuccessful, should be used to calculate the net subrogation amount.

Employer counters that the right of subrogation is absolute under Section 319 of the Act.[6] Without subrogation, Claimant would receive double payment for the same loss, creating a windfall recovery. Further, Employer maintains that because it did not agree to participate in Claimant's expense of litigation such as that against the landlord, it cannot be required to share in its costs.

The first issue is whether the Board correctly permitted Employer to subrogate against funds paid to Claimant by PIGA. Claimant asserts that the payment he received from PIGA was net of his workers' compensation benefits and, thus, to permit Employer to subrogate against his PIGA payment would result in a double offset.

◼ As noted by Claimant, in *Cullen v. Pennsylvania Property and Casualty Insurance Guaranty Association*, 760 A.2d 1198 (Pa.Cmwlth.2000) this Court established that an employer may not subrogate against a guaranty association payment where it would effect a double offset for workers' compensation benefits. In *Cullen*, the Pennsylvania Property and Casualty Insurance Guaranty Association[7] (Guaranty Association) paid $31,094.48 on a medical malpractice claim that arose from the treatment rendered to Cullen for her work-related injuries. The Guaranty Association calculated the $31,094.48 by subtracting $168,905.52, which Cullen had received in workers' compensation benefits, from the $200,000 it agreed to pay. Employer's insurer then sought subrogation against the amount Claimant had received from the Guaranty Association and other sources. Cullen filed a declaratory judgment arguing that the employer's subrogation was inappropriate and would permit a double offset for benefits only paid once. We agreed.

---

**5.** Section 319 of the Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 671(Act). Section 319 states in pertinent part that "[w]here the compensable injury is caused in whole or in part by the act or omission of a third party, *the employer shall be subrogated to the right of the employe ... against such third party to the extent of the compensation payable* under this article by the employer; *reasonable attorney's fees* and other proper disbursements incurred in obtaining a recovery or in effecting a compromise settlement *shall be prorated between the employer and the employe. ...*" (emphasis added).

**6.** *See supra,* n. 4.

**7.** As noted in n. 2, *supra*, the Guaranty Association is the statutory successor to PIGA.

*Cullen* forbids charging a claimant's tort recovery twice for the same workers' compensation benefits: once by the Guaranty Association and next by the employer. However, *Cullen* interpreted the 1994 Act, not the PIGA Act, which is the act controlling Claimant's payment.

There are differences between the 1994 Act and the PIGA Act. The 1994 Act contains a "non-duplication of recovery" provision that requires claimants to exhaust all other sources of insurance before presenting a claim to the Guaranty Association. It states:

> Any person having a claim under an insurance policy shall be required to exhaust first his right under such policy. For purposes of this section, *a claim under an insurance policy shall include a claim under any kind of insurance,* whether it is a first-party or third-party claim, *and shall include,* without limitation, accident and health insurance, *worker's compensation,* Blue Cross and Blue Shield and all other coverages except for policies of an insolvent insurer. *Any amount payable on a covered claim under this act shall be reduced by the amount of any recovery under other insurance.*

40 P.S. § 991.1817(a) (emphasis added).[8] The "non-duplication of recovery" provi-sion in the PIGA Act is not as precise. It states as follows:

> Any person having a claim against an insurer under any provision in an insurance policy other than a policy of an insolvent insurer *which is also a covered claim,* shall first be required to exhaust his right *under such policy. Any amount payable on a covered claim under this act shall be reduced by the amount of any recovery under such insurance policy.*

40 P.S. § 1701.503(a) (emphasis added). Unlike the 1994 Act, the non-duplication provision of the PIGA Act does not specify a workers' compensation policy as one subject to the exhaustion requirement.[9]

There is conflicting authority on whether PIGA may offset for workers' compensation benefits. The WCJ, in its initial decision, relied upon *Besack v. Rouselle Corp.,* 706 F.Supp. 385 (E.D.Pa.1989). In its remand decision, the Board, however, relied upon *Miles v. VanMeter,* 427 Pa.Super. 278, 628 A.2d 1159 (1993). Accordingly, a discussion of each case is appropriate.

In *Besack v. Rouselle Corp.,* the U.S. District Court considered the right of PIGA to offset for workers' compensation benefits. In that case, the tortfeasor's insurer was insolvent. The defendant sought defense and indemnification from

---

8. *See Panea v. Isdaner,* 773 A.2d 782, 791 (Pa.Super.2001) (wherein the Superior Court explained that non-duplication of recovery relieves the industry, and ultimately the policyholders who fund claim payments with premium.)

9. This distinction between the two guaranty association statutes was noted in *Fetters v. Pennsylvania Property and Casualty Insurance Guaranty Association,* 804 A.2d 126 (Pa. Cmwlth.2002). In *Fetters,* the Guaranty Association asserted the right to offset payment on a medical malpractice claim by the amount of workers' compensation benefits paid to the claimant. The claimant argued that the PIGA Act, not the 1994 Act, was applicable, and contended that the PIGA Act did not permit an offset for workers' compensation benefits. This Court held that the date of the insolvency, not the date of the injury, determines whether the 1994 Act or the PIGA Act applies. Under this test, the 1994 Act was found to apply, and the Guaranty Association was permitted to offset for workers' compensation benefits received by the claimant in calculating what it owed for the claimant's tort loss. Although *dictum, Fetters* provides authority for the view that PIGA, unlike the Guaranty Association, does not require its claimants to exhaust workers' compensation benefits before seeking a claim from PIGA.

the Illinois Guaranty Fund, and the plaintiff sought recovery from PIGA. The parties settled for $300,000. The Illinois Guaranty Fund contributed its statutory limit of $150,000 to the settlement amount. PIGA paid the remainder, net of payments received by plaintiff from the Illinois Guaranty Fund and net of workers' compensation benefits. The plaintiff then sought to have PIGA ordered to reinstate the offset it had taken for workers' compensation benefits. The District Court, attempting to predict how the Pennsylvania Supreme Court would rule on PIGA's ability to offset, denied the request. The Court reasoned that PIGA's offset was appropriate in order to avoid double recovery.[10]

In *Miles v. VanMeter*, the Superior Court held the Pennsylvania Workers' Compensation Security Fund (Security Fund)[11] could assert an employer's subrogation rights against a recovery paid by another state guaranty fund on a tort claim. In that case, the claimant had entered into a settlement with the Illinois Insurance Guaranty Association, which paid the statutory maximum. The court noted that the subrogation rights of Section 319 of the Act extend to the employer's insurer, and since the Security Fund steps into the shoes of the employer's insolvent insurer, the court reasoned that the Security Fund can assert Section 319

subrogation rights. The fact that the parties characterized the Illinois payment as net of workers' compensation benefits was not dispositive. The parties could not, by agreement, abrogate the Security Fund's Section 319 subrogation rights. The Board found the *Miles* reasoning and holding to be dispositive of Employer's right to subrogate against PIGA's payment to Claimant at the statutory maximum amount.[12]

*Miles* is also consistent with our holding in *Thompson v. Workers' Compensation Appeal Board (USF & G Co. and Craig Welding Equipment Rental)*, 801 A.2d 635 (Pa.Cmwlth.2002). In 1988, Thompson was injured on the job when a platform collapsed. He received a total of $105,744.63 in workers' compensation benefits. Thompson and his wife filed a product liability action against the platform manufacturer, which was settled for $300,000. The parties characterized the settlement as $200,000 for Thompson's pain and suffering, and $100,000 for Rose Thompson's loss of consortium. We allowed the employer to subrogate against the $200,000 "pain and suffering" settlement paid to Thompson. In doing so, we noted our Supreme Court's directive

> that an employer's subrogation right under Section 319 is absolute, and not subject to *ad hoc* equitable exceptions.

10. The WCJ relied on *Besack* for the proposition that PIGA was obligated to offset for workers' compensation benefits. The holding stands for the proposition that double recovery will not be permitted, but it does not interpret the PIGA Act as mandating an offset. However, even if the PIGA Act did mandate an offset for workers' compensation benefits, there is no evidence that it did so here.

11. The Security Fund was created by the Workers' Compensation Security Fund Act, Act of July 1, 1937, P.L. 2532, *as amended*, 77 P.S. §§ 1051–1066. It provides workers' compensation benefits to injured workers where the employer's insurer has become in-

solvent. Section 3 of the Workers' Compensation Security Fund Act, 77 P.S. § 1053.

12. Claimant asserts that the settlement amount was, in effect, an amount that was compromised by the insolvency of the insurer whereby the policy limits were reduced to the statutory limit. Any further deduction for subrogation would, therefore, be inequitable to Claimant. The record does not reveal the limits of the liability policy of the defendant. Employer asserts that any claim that the recovery would have been higher than the statutory limits is speculative and dehors the record.

*Thompson,* 801 A.2d at 637 (citations omitted). In short, parties to a tort claim settlement cannot defeat an employer's subrogation rights by characterizing the settlement as net of worker's compensation benefits.

The Board distinguished the case *sub judice* from *Cullen.* In *Cullen,* the Guaranty Association took an offset of $168,905.52 against the $200,000 it owed to the claimant, resulting in a net payment to Claimant of $31,094.48. Here, by contrast, PIGA did not make any deductions for the $176,091.28 Claimant had received in workers' compensation benefits as of May 1999. Instead, PIGA paid out the full amount of statutory coverage: $300,000, minus the policyholder $100 deductible. Further, the parties did not characterize the PIGA payment as net of workers' compensation or for pain and suffering alone. Under *Thompson* and *Miles,* however, any such characterization would not be allowed to defeat subrogation under Section 319 of the Act.

■ There is a strong policy against construing statutes in a way that results in a double offset. Equally strong is the policy against double recovery. Non-duplication of statutory benefits is the goal of Section 319 of the Act as well as the PIGA Act and the 1994 Act. As observed by the Board, any other result would place Claimant in a better position than if the tortfeasor's insurer had never become insolvent.[13] We agree with the Board's analysis and hold that under Section 319 of the Act, Employer is authorized to subrogate against the statutory maximum payment made by PIGA to Claimant.

Claimant's second issue is that the Board erred in not allowing Claimant to offset all litigation costs in calculating the subrogation amount owed to Employer. We disagree.

■ The Board correctly determined that the language of Section 319 of the Act directs a proration between Employer and Claimant of "reasonable attorney's fees and other proper disbursements incurred in obtaining a recovery or in effecting a compromise settlement...." 77 P.S. § 671. The words of this statute are clear and free from all ambiguity, and the letter of it is not to be disregarded under the pretext of pursuing it in spirit. 1 Pa.C.S. § 1921(b).[14] The WCJ erred in including the costs of the unsuccessful litigation within the purview of Section 319 of the Act. Litigation efforts that do not obtain a recovery or effect a settlement are not subject to proration between Employer and Claimant.

For these reasons, the decision of the Board is affirmed.

President Judge COLINS concurs in the result only.

### ORDER

AND NOW, this 17th day of November, 2003, the order of the Workers' Compensation Appeal Board dated March 4, 2003 in the above-captioned matter is hereby affirmed.

---

**13.** This is at odds with the purpose of guaranty associations, which is to minimize, within statutory limits, the impact of an insurer insolvency.

**14.** It states:

> When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.
>
> 1 Pa.C.S. § 1921(b).