916 A.2d 553

Lynda **CARROZZA**

v.

Roy **GREENBAUM**, M.D., Radiology Affiliates of Central New Jersey, P.A., St. Agnes Medical Center, Kathryn A. Evers and Hahnemann University Hospitals, East, Allegheny University of the Health Sciences D/B/A Allegheny University Imaging Services, Hahnemann University Hospital, MIIX Insurance Company and Pennsylvania Property and Casualty Insurance Guaranty Association,

Appeal of Pennsylvania Property and Casualty Insurance Guaranty Association.

Lynda Carrozza

v.

Roy Greenbaum, M.D., St. Agnes Medical Center, Kathryn A. Evers, M.D., Hahnemann University Imaging Services, and Radiology Affiliates of Central New Jersey, P.A., and MIIX Insurance Company, and Pennsylvania Property and Casualty Insurance Guaranty Association,

Appeal of Pennsylvania Property and Casualty Insurance Guaranty Association.

Lynda Carrozza

v.

Roy Greenbaum, M.D., Radiology Affiliates of Central New Jersey, P.A., St. Agnes Medical Center, Kathryn A. Evers, M.D., Allegheny University Hospitals East, Allegheny University of the Health Sciences D/B/A Allegheny University Imaging Services and Hahnemann University Hospital, MIIX Insurance Company, Pennsylvania Property and Casualty Insurance Guaranty Association

Appeal of Pennsylvania Property and Casualty Insurance Guaranty Association.

Lynda Carrozza

v.

Roy Greenbaum, M.D., Radiology Affiliates of Central New Jersey, P.A., St. Agnes Medical Center, Kathryn A. Evers, M.D., Allegheny University of the Health Sciences D/B/A Allegheny University Imaging Services, Hahnemann University Hospital,

**MIIX Insurance Company and Pennsylvania Property and Casualty Insurance Guaranty Association**

**Appeal of Pennsylvania Property and Casualty Insurance Guaranty Association.**

Supreme Court of Pennsylvania.

Argued March 1, 2006.

Decided Feb. 20, 2007.

Gregory Buchwald Heller, Esq., Young Ricchiuti Caldwell & Heller, L.L.C., Philadelphia, for Pennsylvania Trial Lawyer's Association.

Cindy Elaine Sheaffer, Esq., PA Department of Insurance, Enola, for amicus curiae Medical Care Availability and Reduction Error Fund successor to MPLCLF.

Joseph M. Hankins, Esq., Lise Luborsky, Esq., Britt, Hankins & Moughan, Philadelphia, for Pennsylvania Property and Casualty Insurance Guaranty Association.

Sara Anderson, Frey, Esq., Cozen O'Connor, Philadelphia, for MIIX Insurance Company.

Randy A. Mariano, Esq., Harvey, Pennington, Ltd., Allegheny University Hospitals East, et al.

Ronald L. Wolf, Esq., Weinstein, Schleifer & Kupersmith, P.C., Philadelphia, for Lynda Carrozza.

Deborah Susan Baird, Esq., Ann Cairns, Esq., Peter J. Hoffman, Esq., McKissock & Hoffman, P.C., Philadelphia, for St. Agnes Medical Center.

F. James Gallo, Esq., Harvey, Pennington, Cabot, Griffith & Renneisen, Ltd., Philadelphia, for Roy Greenbaum, M.D., Radiology Affiliates of Central New Jersey, P.A.

Paul E. Peel, Esq., O'Brien & Ryan, L.L.P., Meeting, for Kathryn Evers and Hahnemann University Hospital, et al.

J. Scott Kramer, Esq., Helena I. Poch Ciechanowski, Esq., Duane Morris, L.L.P., Philadelphia, for amicus curiae Hospital and Healthsystem Association of PA.

BEFORE: CAPPY, C.J., and CASTILLE, NEWMAN, SAYLOR, EAKIN, BAER and BALDWIN, JJ.

## OPINION

Justice BAER.

We granted allowance of appeal to consider a question of first impression arising under the Pennsylvania Property and Casualty Insurance Guaranty Association Act (Act), Act of Dec. 12, 1994, P.L. 1005, No. 137 § 1, *as amended*, 40 P.S. §§ 991.1801–991.1820, which was enacted in furtherance of the following purposes:

(1) To provide a means for the payment of covered claims under certain property and casualty insurance policies, to

avoid excessive delay in the payment of such claims and to avoid financial loss to claimants or policyholders as a result of the insolvency of an insurer.

(2) To assist in the detection and prevention of insurer insolvencies.

(3) To provide for the formulation and administration by the Pennsylvania Property and Casualty Insurance Guaranty Association of a plan of operation necessary to effectuate the provisions of this article.

40 P.S. § 991.1801.[1] The Act accomplishes this in part by charging the Pennsylvania Property and Casualty Insurance Guaranty Association (PPCIGA or Association) with what we have characterized as "remedial obligations" *vis-à-vis* an insolvent insurer, pursuant to which PPCIGA assumes an insurer's rights and obligations in the event of that insurer's bankruptcy. *Bell v. Slezak*, 571 Pa. 333, 812 A.2d 566, 570 (2002); 40 P.S. §§ 991.1803(b)(1)-(2). The Association is funded by assessments applied to every insurance company that writes property and casualty policies in the Commonwealth of Pennsylvania. *See Bell*, 812 A.2d at 570–71; 40 P.S. §§ 991.1803(b)(3), 991.1808.[2]

We granted allowance of appeal to resolve a point of tension among the Act's purposes and the mechanisms by means of which PPCIGA accomplishes them:

Where two defendants are found jointly and severally liable, one defendant has sufficient insurance coverage to satisfy the entire judgment, and the other defendant's insurer is

**1.** The 1994 legislation repealed, revised, and recodified the predecessor Pennsylvania Insurance Guaranty Association Act, Act of Nov. 25, 1970, P.L. 716, No. 232 §§ 101, *et seq.*, 40 P.S. §§ 1701.101, *et seq.* (repealed).

**2.** In *Sands v. Commonwealth*, 283 Pa.Super. 217, 423 A.2d 1224, 1225–26 (1980), the Superior Court provided a thorough account of the conditions that led first to the proposal, by the National Association of Insurance Commissioners, of the "State Post-Assessment Insurance Guaranty Association Model Bill," which has been adopted in some form by the vast majority of states including Pennsylvania in the form of the above-cited 1970 legislation. The *Sands* account has been cited favorably by this Court, *see, e.g.*, *Bell*, 812 A.2d at 570–71, and we need not restate it except insofar as necessary to inform the analysis that follows.

insolvent, may a court direct the judgment creditor to seek satisfaction exclusively from the solvent insurer, thus effectively discharging the Pennsylvania Property & Casualty Insurance Guaranty Association of all liability?

*Carrozza v. Greenbaum*, 584 Pa. 154, 882 A.2d 1000 (2005) (*per curiam* ). The answer to this question hinges on our interpretation of the Act's "non-duplication of recovery" provision.[3] For the reasons that follow, we find that the answer to this question is a qualified "No." Rather, we hold generally that PPCIGA, when it has assumed the liabilities of an insolvent insurer pursuant to § 1803 of the Act, stands in the shoes of that insurer for purposes of joint and several liability. As in any other joint and several judgment situation, the judgment creditor may seek satisfaction of its judgment from PPCIGA to the extent of the entire judgment or the statutory cap on PPCIGA's liability,[4] whichever is lower.[5] Accordingly, we affirm.

The events that precipitated this litigation are materially undisputed. In February 1996, then-thirty-six-year-old Lynda Carrozza went to St. Agnes Medical Center for a baseline screening mammogram. Radiologist Roy Greenbaum, M.D., examined Carrozza's scans and observed calcifications in her right breast. He found the calcifications insufficiently "suspicious" to warrant further testing at that time, concluding that

---

**3.** The provision provides, in relevant part:

**§ 991.1817. Non-duplication of recovery**

(a) Any person having a claim under an insurance policy shall be required to exhaust first his right under such policy. For purposes of this section, a claim under an insurance policy shall include a claim under any kind of insurance, whether it is a first-party or third-party claim, and shall include, without limitation, accident and health insurance, worker's compensation, Blue Cross and Blue Shield and all other coverages except for policies of an insolvent insurer. Any amount payable on a covered claim under this act shall be reduced by the amount of any recovery under other insurance.

40 P.S. § 991.1817.

**4.** PPCIGA's liability currently is capped by statute at $300,000 per "covered claim." 40 P.S. § 991.1803(b)(1)(i)(B).

**5.** PPCIGA, of course, is then free to seek contribution from any tortfeasor or his or her insurer.

they likely were benign. He recommended that Carrozza return for a routine mammogram two years hence.

In May 1998, Carrozza entered Hahnemann University Hospital, then part of the Allegheny University Health System, to undergo another breast screening. Radiologist Kathryn Evers, M.D., reviewed the new screens and compared them to the 1996 screens, noting no change in the calcifications in Carrozza's right breast. Like Greenbaum before her, Evers concluded that the calcifications were benign, and recommended that Carrozza return one year later for another mammogram.[6]

In August 1999, Carrozza discovered a lump in her right armpit. A few weeks later, she detected a mass in her right breast. On September 24, 1999, an oncologist examined Carrozza's right breast, noting a 9 by 10 cm mass and an abnormal lymph node. Subsequent needle biopsies, performed in three locations in Carrozza's breast, all tested positive for carcinoma. From September 1999 into spring of the following year, Carrozza endured eight cycles of aggressive chemotherapy, a radical mastectomy, numerous reconstructive procedures, and radiation therapy.

In June 2000, Carrozza filed a medical malpractice complaint against Greenbaum, Evers, and their respective practices and associated hospitals. In February 2002, during pendency of this suit, PHICO Insurance, which insured Evers and her practice group, declared bankruptcy. Pursuant to its statutory mandate, PPCIGA stepped into the shoes of PHICO for purposes of the instant litigation, assuming PHICO's defense and its liability up to PPCIGA's statutory damage cap. Thus, the relevant parties included the defendant physicians and hospital, PPCIGA in place of PHICO for Evers, and MIIX Insurance Group (MIIX) on behalf of Greenbaum.

In January 2003, the parties went to trial. Carrozza presented two expert witnesses, who offered evidence tending to

6. In May 1999, a third radiologist, Geraldine Hamilton, M.D., reviewed a third set of scans and concluded that the calcifications in Carrozza's right breast were benign. Hamilton neither testified at trial nor is named as a party to this action.

show that Greenbaum's and Evers's respective failures to order biopsies constituted breaches of their duties of care, and that these failures led to a delayed diagnosis, thus necessitating more invasive and aggressive treatment than would have been required following a more timely diagnosis, as well as causing a significant reduction of Carrozza's life expectancy. After deliberating for a day and a half, the jury, responding to special interrogatories, found Greenbaum and Evers equally liable (50% / 50%) for Carrozza's harm, and awarded her $4 million. The court molded the jury verdict to include the named physicians' practice groups and associated hospitals on the basis of vicarious liability. It further ruled that liability was joint and several within each of the two groups of defendants, with each group separately liable for $2 million.

Subsequently, Greenbaum and Evers filed post-trial motions seeking judgment notwithstanding the verdict, new trial, *remmititur*, and allocation of responsibility among the coverage entities implicated by the verdict—MIIX for Greenbaum and PPCIGA (in place of the insolvent PHICO) for Evers. MIIX and PPCIGA filed petitions to intervene, which were granted. Carrozza also filed a post-trial motion seeking delay damages. Argument commenced May 28, 2003, following which, by Opinion and Order dated June 13, 2003, the court denied the defense motions, granted Carrozza delay damages, and molded the verdict to impose joint and several liability for the entire verdict—$4 million plus $482,000 in delay damages—across all defendants collectively rather than in two equal portions respectively over the group of defendants associated with each doctor. In so doing, the trial court specifically noted that its prior allocation "was in no way meant ... to reflect a decision that joint and several liability among all Defendants did not exist." Tr. Ct. Op., 6/13/03, at 14–15. In support of its ruling combining joint and several liability with an express 50% / 50% allocation of responsibility between the two groups of defendants, the court quoted our decision in *Allen v. Mellinger*, 567 Pa. 1, 784 A.2d 762 (2001), to the effect that "[a]pportionment of liability for damages among defendants in this fashion, whether compensatory damages or delay

damages, does not in an of itself conflict with application of the rule of joint and several liability." *Id.* at 765.[7]

The trial court also considered PPCIGA's contention that Carrozza was bound to seek recovery from MIIX prior to seeking recovery from PPCIGA. Finding no on-point Pennsylvania precedent, the court, relying on two reported Ohio cases,[8] determined that the non-duplication provision of the Act required Carrozza to exhaust the MIIX policy's coverage limits before seeking recovery from PPCIGA. Because the MIIX policy covered Greenbaum up to $5 million, more than the amount owed Carrozza pursuant to the verdict, the court ruled that PPCIGA's liability was wholly extinguished.

The various parties filed appeals to the Superior Court, which were consolidated and decided in one published opinion. *See Carrozza v. Greenbaum,* 866 A.2d 369 (Pa.Super.2004). The court's lengthy opinion addressed defendants' various challenges regarding evidentiary sufficiency, the jury's weighing of the evidence, the putative excessiveness of the verdict, and MIIX's challenge to the trial court's apportionment of liability and the court's direction to Carrozza to seek satisfaction of the verdict solely from MIIX pursuant to the court's interpretation of the non-duplication provision. Because we only granted allowance of appeal with regard to the last of these issues, we review the court's reasoning only as to that question.

After recounting the history of the PPCIGA Act, the court turned to the non-duplication provision. It began by reading the title, "Non-duplication of recovery," as dispositive of the provision's purpose, observing that it "only prohibits recovering duplicatively, *i.e.* [,] twice for the same loss." *Id.* at 385; *see* 1 Pa.C.S. § 1924 ("The headings prefixed to titles, parts, articles, chapters, sections and other divisions of a statute shall not be considered to control but may be used to aid in

---

7. Presumably, apportioning liability in this fashion serves to preempt a second trial regarding contribution.

8. *See* Tr. Ct. Op., 6/13/03, at 23 (citing *Sutton v. Scheidt,* 141 Ohio App.3d 289, 750 N.E.2d 1184 (Ct.App.2001); *Vickers v. Howe,* 123 Ohio App.3d 456, 704 N.E.2d 344 (Ct.App.1998)).

the construction thereof."). It then turned to the text, which provides:

Any person having a claim under an insurance policy shall be required to exhaust first his right under such policy. For purposes of this section, a claim under an insurance policy shall include a claim under any kind of insurance, whether it is a first-party or third-party claim, and shall include, without limitation, accident and health insurance, worker's compensation, Blue Cross and Blue Shield and all other coverages except for policies of an insolvent insurer. Any amount payable on a covered claim [9] under this act shall be reduced by the amount of any recovery under other insurance.

40 P.S. § 991.1817(a). It read the first sentence "to require that a claimant covered by a first-party or third-party insurance contract for the same injury for which the claimant is making a 'covered claim' under the PPCIGA Act must first exhaust all benefits available under that policy as provided by the insurance contract." *Carrozza*, 866 A.2d at 386 (footnote omitted). The Court read the second sentence to clarify the first sentence by providing a list of examples of the insurance policies subject to the exhaustion requirement. *Id.* Critically, the court concluded that the provision applied only to *insureds* under more than one policy covering the claim in question, and required such an *insured* to exhaust coverage for the claim at issue from its solvent insurer before seeking recovery from PPCIGA standing in the stead of another insurer who had become insolvent at some time after the claim in question had arisen. Thus, the court held that, because Carrozza was not an "insured" under the MIIX policy but rather a claimant *against* an insured, she was not bound to exhaust that policy before seeking satisfaction of the judgment from PPCIGA.

9. A "covered claim" is defined, in relevant part, as:

(1) An unpaid claim, including one for unearned premiums, submitted by a claimant, which arises out of and is within the coverage and is subject to the applicable limits of an insurance policy to which this article applies issued by an insurer if such insurer becomes an insolvent insurer after the effective date of this article....

40 P.S. § 991.1802.

In support of its interpretation, the court turned to its decision in *Sands v. Pennsylvania Ins. Guar. Ass'n,* 283 Pa.Super. 217, 423 A.2d 1224 (1980), which it decided under the predecessor PIGA Act. In that case, plaintiff Sands was injured as a passenger in a car driven by Davis when it collided with a car driven by Patton, who lacked insurance. Sands released Davis's insurer from all claims for consideration of $10,000, and then sought to recover from his own insurer for uninsured motorist benefits due to Patton's lack of insurance. Sands's insurer initially refused to pay, but Sands successfully sued the insurer and was awarded $10,000. During the litigation, Sands's insurer was declared insolvent. Sands then applied to PIGA for payment in *lieu* of the insolvent insurer, but PIGA refused to pay.

In the ensuing litigation, PIGA took the position that Sands was precluded from recovering from PIGA unless and until he had exhausted his claims against Davis's solvent insurer, under the PIGA Act's non-duplication of recovery provision, the predecessor to the provision at issue in the instant case. First, the court noted that in the posture of the case there was no way for the court to discern whether Davis had been negligent to begin with, and without such a finding it could not be determined whether Sands had any claim to exhaust even if such were required. Assuming Davis had been negligent, however, the *Sands* court held that "the most that could then be said would be that Sands was 'a person having a claim against' Davis; he would not be a person having a claim against Davis's 'insurer'...." *Id.* at 1227. Accordingly, the court ruled that Sands could recover from PIGA notwithstanding the settlement it had reached with Davis's insurer for less than the limits of Davis's policy.

The lower court in the case *sub judice* ruled that *Sands* controlled. Citing courts in other states that have agreed with the *Sands* court's reasoning—and noting that this Court "continues to cite *Sands* for general propositions, negating any argument by PPCIGA that the decision is no longer good law" [10]—the court found *Sands* to stand for the proposition

10. While the Superior Court is correct that we have continued to cite *Sands, see, e.g., Bell,* 812 A.2d at 570–71, we have done so for truly

that the non-duplication provision does not apply to Carrozza because she has no "claim" as an insured, in the sense forwarded by *Sands*, to enforce directly against MIIX. *Carrozza*, 866 A.2d at 387. In buttressing its conclusion, it reasoned:

> While the amended non-duplication provision now provides a clarifying list of the types of first-party and third-party insurance which must be exhausted,[11] it makes no mention of joint tortfeasors, joint and several liability, insurance applicable to a different claim, or insurance held by another party to a lawsuit. In addition, there is nothing in the legislative history, nor is *Sands* referenced in the amended act itself, indicating that the Legislature did *not* intend to include a joint tortfeasor's insurance in the list of insurance which must first be exhausted before PPCIGA's obligation to pay is triggered.

*Id.* at 388 (emphasis in original; citation omitted). Closing the door on PPCIGA's remaining argument to the contrary, the court also expressly held that a finding of joint and several liability "does not equate to the contractual obligation under an insurance policy as contemplated in the PPCIGA Act." *Id.*[12]

"general propositions." In *Bell*, for example, we cited *Sands* in support of our articulation of the PPCIGA's purposes, *id.* at 570, and in support of the proposition that "[t]he PPCIGA Act and its predecessor were derived from a model, uniform law." *Id.* at 571. These hardly amount to ringing endorsements of the pertinence of an intermediate appellate court case decided in 1980 under a predecessor statute to the current, narrow inquiry, which hinges on a non-duplication provision that has been substantially revised in the interim. *See infra* n.11 (comparing the provisions).

11. *Compare* 40 P.S. § 1701.503(a) (repealed and replaced as of Feb. 10, 1995) ("Any person having a claim against an insurer under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim, shall first be required to exhaust his right under such policy.") *with* 40 P.S. § 991.1817(a) (repeating substantially the same caveat, but defining "a claim under an insurance policy" to encompass "a claim under any kind of insurance, . . . includ[ing] . . . accident and health insurance, worker's compensation, Blue Cross and Blue Shield and all other coverages except for policies of an insolvent insurer").

12. Although the court went on to consider further persuasive authority and other aspects of the question and its response, we need not review its reasoning further, because we conclude, *infra*, that this first premise is erroneous.

 As noted, *supra*, we granted allowance of appeal to consider whether, in the event of a joint and several judgment against two physicians, one of whom is the insured of a solvent insurer and the other of whom is, in effect, the insured of PPCIGA standing in the place of an insolvent insurer, the judgment creditor must seek satisfaction of the judgment from the solvent insurer up to the limits of its coverage before seeking satisfaction from PPCIGA.[13] In this case, should we rule that Carrozza must seek satisfaction of her judgment in the first instance from MIIX as insurer for Greenbaum, PPCIGA will owe nothing, as the MIIX policy provides coverage in excess of Carrozza's entire judgment against the two physicians. Moreover, in so ruling we would hold in effect that the legislature intended by implication to repudiate the time-honored principles of joint and several liability in cases where PPCIGA has assumed responsibility for a joint tortfeasor's insolvent insurer. The Superior Court, relying chiefly on its decision in *Sands,* determined that Carrozza's lack of direct legal relationship with the insurers precluded application of the PPCIGA Act's "non-duplication of recovery" provision, the mechanism PPCIGA argues supersedes joint and several liability in PPCIGA cases and compels Carrozza to exhaust all other avenues of recovery before seeking satisfaction of her judgment from PPCIGA. Because its ruling on this point hinged on Carrozza's putative status as a stranger to the relevant insurance policies, we begin by assessing the Superior Court's basis for so holding.

The question whether Carrozza has a "claim under an insurance policy" vis-à-vis Greenbaum's insurer sufficient to require application of the non-duplication provision's "exhaustion" requirement stems from that provision's language:

> *Any person having a claim under an insurance policy shall be required to exhaust first his right under such policy.* For purposes of this section, a claim under an insurance policy shall include a claim under any kind of insurance,

13. In this, as in all questions of law, the scope of our review is plenary and we review the question *de novo. Fritz v. Wright,* 907 A.2d 1083, 1088 (2006).

*whether it is a first-party or third-party claim,* and shall include, without limitation, accident and health insurance, worker's compensation, Blue Cross and Blue Shield and all other coverages except for policies of an insolvent insurer. Any amount payable on a covered claim under this act shall be reduced by the amount of any recovery under other insurance.

40 P.S. § 991.1817(a) (emphasis added). Appellee MIIX, echoing the Superior Court's reasoning, maintains that the claim in question must be contractual as between the putative claimant and the insurer in question. Brief for MIIX at 10 (citing *Panea v. Isdaner,* 773 A.2d 782, 790 (Pa.Super.2001) (*en banc* )). It argues that § 1817(a) manifests the legislature's "intention for fiscally solvent insurers who are '**contractually obligated** to pay a claim [to] be the primary source of payment.'" *Id.* at 9–10 (quoting *Panea,* 773 A.2d at 790) (modification added; emphasis added by MIIX); *cf. Panea,* 773 A.2d at 790 (rejecting resort to commonlaw contract principles, and noting contrarily that "to the extent there was insurance coverage, the right to payment constitutes nothing more than *a claim against a tortfeasor* who was insured by that insurer" (emphasis added)).

MIIX stresses that the non-duplication provision refers to exhaustion of "a claim under an insurance policy" and contends that this signals the legislature's intent to apply the non-duplication provision only to those with direct claims *as insureds* under the enumerated categories of insurance policies. MIIX notes that, as a general rule, a party injured by an insured tortfeasor is "a stranger to the relationship between the insured and the insurer." *Gray v. N'wide Mut. Ins. Co.,* 422 Pa. 500, 223 A.2d 8, 11 (1966). Thus, MIIX maintains that because Carrozza had no *contractual* right under the MIIX policy insuring Greenbaum—and indeed no direct legal relationship with MIIX whatsoever—she has no "claim under an insurance policy" that she must exhaust before seeking satisfaction from PPCIGA.

■ This argument is not without support in the common law of contract, as evinced by the Superior Court's considered

treatment of the question, but neither is it the exclusive available interpretation. As the Superior Court noted in *Panea*, "a statutory remedy is favored over the common law." 773 A.2d at 789 (citing 1 Pa.C.S. § 1504). The Superior Court and MIIX both overlook the fact that this Court settled the question on statutory grounds in favor of the opposing view in *Bell*.[14]

Although *Bell* is factually distinguishable from the instant case,[15] we nevertheless found it necessary in our resolution of that case to determine whether a "claim under an insurance policy," as used in the non-duplication provision, encompasses a plaintiff with a claim against an insured whose insurer is solvent. Specifically, we addressed the Superior Court's determination in the underlying case that, under such circumstances, the plaintiff's "right to payment . . . is 'nothing more than a claim against an insolvent insurer by virtue of having a claim against a tortfeasor,'" and that the plaintiff therefore must satisfy the requirements of the non-duplication provision's exhaustion requirement before seeking satisfaction from PPCIGA. *Bell*, 812 A.2d at 569 (quoting *Panea*, 773 A.2d at 789).

We began our analysis in *Bell* by acknowledging that the model, uniform law from which Pennsylvania's PPCIGA Act and predecessor PIGA Act were derived, "particularly as applied in the areas of exhaustion and non-duplication of

**14.** *Panea* and *Bell* were two of three cases consolidated under the *Panea* caption for *en banc* review by the Superior Court; the third was *Baker v. Myers*. *See Panea*, 773 A.2d at 786–87 & n. 1. Of the three petitions for allowance of appeal arising from that case, we granted allowance of appeal only as to *Bell*.*Compare Bell v. Slezak*, 566 Pa. 539, 782 A.2d 509 (2001) (*per curiam*) (granting allowance of appeal) *with Panea v. Isdaner*, 576 Pa. 725, 841 A.2d 532 (*per curiam*) (denying allowance of appeal); *Baker v. Myers*, 576 Pa. 718, 841 A.2d 528 (*per curiam*) (same).

**15.** Relevantly, in *Bell* we did not purport to reconcile principles of joint and several liability with application of the non-duplication provision under the Act. By its own terms, however, the case dealt with "multiple, foundational questions concerning the application of provisions" of the Act, 812 A.2d at 567, among which was the question of whether a plaintiff has "a claim under an insurance policy" vis-à-vis a tortfeasor's insurer for purposes of the Act's non-duplication provision. *Id.* at 572. Thus, our discussion of that issue was an essential part of our holding in *Bell* and is *stare decisis* as to that question in the instant case.

recovery, . . . has been described as being plagued by multiple ambiguities and apparent inconsistencies." *Id.* at 571. To illustrate the disparity, we cited divergent opinions from courts of last resort in New Hampshire and Maryland. *Compare New Hampshire Ins. Guar. Ass'n v. Pitco Frialator, Inc.,* 142 N.H. 573, 705 A.2d 1190, 1192–93 (1998) (holding that a third-party claimant against a defendant with a solvent insurer is a "claimant" against that insurer for purposes of New Hampshire's non-duplication provision) *with Ins. Comm'r of State of Maryland v. Prop. & Cas. Ins. Guar. Corp.,* 313 Md. 518, 546 A.2d 458, 463–64 (1988) (holding only "insureds" to be claimants for purposes of Maryland's non-duplication provision).

In determining which paradigm to apply to the PPCIGA Act, we found New Hampshire's holding regarding the scope of its non-duplication provision in *Pitco Frialator* to be more harmonious with the language and intent of Pennsylvania's Act. In particular, we noted that the *Pitco Frialator* decision adopted the more expansive view of "claim under an insurance policy" in part because New Hampshire's parallel act contained multiple, disjunctive references to "claimant" and "insured." To interpret "claimant" to encompass only those insured by the policies in question, the New Hampshire court observed, would render redundant these disjunctive references.[16] We noted that the Act's disjunctive references to "claimants," "policyholders," and "insureds" are a characteristic Pennsylvania's Act shares with New Hampshire's. *See*

---

16. Specifically, the Supreme Court of New Hampshire cited statutory references in its act to "claimants **or** policyholders," "claimant **or** insured," "policyholder **or** claimant," and "insured **or** claimant." *Pitco Frialator,* 705 A.2d at 1193 (citations omitted; emphasis added). Thus, it held that "[a] construction of the statute that equated 'claimant' with 'insured' or 'policyholder' would contravene the fundamental principles that all of the words of a state must be given effect and that the legislature is presumed not to have used superfluous or redundant words." *Id.* (some internal quotation marks omitted). Of course, our principles of statutory construction have provisions that parallel those cited by the *Pitco Frialator* court. *See* 1 Pa.C.S. §§ 1921(a) (directing this court to interpret a statute in a way that gives effect to all its provisions), 1922(2) (directing the presumption that the legislature intends "the entire statute to be effective and certain"). These principles gird the instant inquiry.

*Bell*, 812 A.2d at 572 (citing 40 P.S. §§ 991.1801(1) ("claimants or policyholders"), 991.1802 ("claimant or insured"), 991.1816 ("insured or claimant") (emphasis added)). We also noted that "cognizance of third-party claims is consistent with the ... remedial purposes of the legislation." *Id.* (citing *H.K. Porter Co. v. PIGA*, 75 F.3d 137, 141–42 (C.A.3, 1996)). Notably, the New Hampshire court cited an additional reason in support of its interpretation, a reason we did not cite in *Bell* that nevertheless makes that court's analysis even more persuasive: to "ensure that NHIGA's obligation from a particular occurrence will not vary based on the procedure by which the claim is asserted against NHIGA, *i.e.*, a claim by the injured third party versus a claim by the insured following its payment of a claim asserted against it by the injured third party." *Pitco Frialator*, 705 A.2d at 1193. This benefit of its ruling on the threshold question concerning the ambit of a "claim under an insurance policy" seems equally applicable to Pennsylvania's PPCIGA Act.

Accordingly, despite the factual differences in *Bell*, this Court clearly ruled that "a claim under an insurance policy" encompasses a plaintiff's entitlement to recovery from a tortfeasor's insurer.[17] The Superior Court therefore erred in the instant case in ruling that the non-duplication provision, all things being equal, could not encompass a party like Carrozza simply because that party lacks a direct right of action against a tortfeasor's insurer. The source of its error lay in its reliance on *Sands*. Notably, this Court, in *Bell*, distinguished the Maryland decision in *Insurance Commissioner of Maryland* that this Court rejected in favor of the *Pitco Frialator* approach. The Maryland case, in turn, relied on our Superior

---

**17.** Dispelling any doubt as to the effect of our ruling in *Bell,* we emphatically reinforced the relevant language in a subsequent decision. *See Keystone Aerial Surveys, Inc., v. Pennsylvania Prop. & Cas. Ins. Guar. Ass'n,* 574 Pa. 147, 829 A.2d 297, 301–02 (2003) (*"Bell* ... defined the term 'claimant' as one who possesses a 'covered claim' under the PPCIGA Act, *and read those terms as detached from whether or not a direct right of action existed in favor of the claimant and against the insolvent insurer under state law."* (emphasis added)); *id.* at 304 ("[T]hird-party plaintiffs holding judgments against an insured ... are claimants under the PPCIGA Act.").

Court's decision in *Sands. See Ins. Comm'r of Md.*, 546 A.2d at 463–64. Thus, in rejecting the reasoning of the Maryland case in *Bell*, we implicitly rejected the reasoning in *Sands*.[18]

■ This does not end our inquiry. Neither *Bell* nor *Pitco Frialator* purported to speak to the interplay of joint and several liability with the non-duplication provision, thus *Bell* controls only as to the subsidiary question of whether Carrozza has a "claim under an insurance policy" for purposes of the non-duplication provision. The question remains whether that provision abrogated, *sub silentio*, long-standing principles of joint and several liability. We turn to that overarching question now, mindful that "[t]he object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a). While our reading of a statute is governed in the first instance by the plain meaning of the statutory language in question, 1 Pa.C.S. § 1921(b), where the language is ambiguous, we may consider, among other factors,

(1) The occasion and necessity for the statute.

(2) The circumstances under which it was enacted.

(3) The mischief to be remedied.

(4) The object to be attained.

(5) The former law, if any, including other statutes upon the same or similar subjects.

(6) The consequences of a particular interpretation.

1 Pa.C.S. § 1921(c). As noted, *supra*, this Court already has marked the "multiple ambiguities and apparent inconsistencies" in the PPCIGA Act, especially in regard to the non-duplication of recovery provision. *Bell*, 812 A.2d at 571. Therefore, we must look beyond the statutory language to glean legislative intent. In doing so, we presume, *inter alia*,

(1) That the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable.

18. To be clear, to the extent *Sands* stands for an account of the non-duplication provision that defines "claim under an insurance policy" more narrowly than this Court did in *Bell*, it is no longer viable law.

(2) That the General Assembly intends the entire statute to be effective and certain.

\* \* \* \*

(5) That the General Assembly intends to favor the public interest as against any private interest.

1 Pa.C.S. § 1922; *cf. Stollar v. Continental Can Co.*, 407 Pa. 264, 180 A.2d 71, 73–74 (1962).

The Superior Court relies substantially on the legislature's failure, in 1994, fourteen years after the Superior Court's decision in *Sands*, to act affirmatively to abrogate that holding in replacing the PIGA Act with the PPCIGA Act. Indeed, it emphasizes the legislature's failure expressly to provide for the situation before us or in any way to address the interplay of joint and several liability with the Act's non-duplication provision. The Superior Court reasoned from this omission to the conclusion that the legislature thereby intended to leave the *Sands* holding intact. This conclusion, however, is effectively immaterial in light of our determination, *supra*, that *Bell* abrogated *Sands* and established that a plaintiff has a "claim under an insurance policy" for purposes of the non-duplication provision.

The Superior Court nevertheless identifies a critical flaw in PPCIGA's position. In declining first in 1970 with the PIGA Act and again in 1994 with the PPCIGA Act to expressly account for joint and several liability, the legislature evinced no intent to *disturb* joint and several liability as conventionally understood. This is no small matter. Joint and several liability as a principle of recovery for an indivisible injury caused by multiple tortfeasors lies at the very heart of the common law of tort, and also has a solid foundation in Pennsylvania's statutory law. *See* Uniform Contribution Among Tort-feasors Act, 42 Pa.C.S. §§ 8321, *et seq.* (providing for the allocation of responsibility among joint tortfeasors). Contrarily, the legislature, both in the former PIGA Act and in the current PPCIGA Act, clearly has attempted to establish the Association as an entity subject to the same "rights, duties and obligations of the insolvent insurer" but for enumerated

limitations, *see* 40 P.S. § 991.1803(b)(2),[19] none of which provides for a modified status where the insolvent insurer is subject to a claim on behalf of its insured who is jointly liable with another party as to whom insolvency plays no role.

We should be and are reluctant to disturb the elemental doctrine of joint and several liability in the absence of express direction from the legislature. *See Commonwealth v. Miller*, 469 Pa. 24, 364 A.2d 886, 887 (1976) ("[S]tatutes are not presumed to make changes in the rules and principles of the common law or prior existing law beyond what is expressly declared in their provisions."). After careful review of the PPCIGA enabling legislation in tandem with the commonlaw tradition of joint and several liability, we find no reason to believe that the legislature intended PPCIGA to be treated any differently than the insurer it replaces for purposes of joint and several liability, where applicable. When the insurer, if solvent, would have been subject to the consequences of joint and several liability, PPCIGA must be subject to those same consequences in the insurer's place, unless a manifest duplication of recovery will occur.[20]

Moreover, under the facts presented, to uphold principles of joint and several liability in this case is to commit PPCIGA to no more than its statutory mandate provides.[21] As the Superior Court ably explained,

19. For example, the Association may "[s]ue or be sued." 40 P.S. § 991.1803(c)(3).

20. This caveat is necessary to honor the express purpose of the PPCIGA Act to protect injured parties from non-recovery due to insurer insolvency. In *Bell*, for example, we found that the Bells' medical insurance payments in excess of $200,000 extinguished PPCIGA's obligations to the Bells in the amount of $200,000. *See* 812 A.2d at 573–74. This did not flout the purpose of the Act, however, because the Bells had not been denied recovery by virtue of PIC's insolvency. *Id.* at 574. Rather, recognizing a set-off for the recoveries under the medical insurance policies merely denied the Bells a windfall, *i.e.*, duplicative recovery of the same losses. Here, however, there is no prior recovery asserted that will be duplicated by virtue of our ruling in favor of Carrozza, and our ruling protects Carrozza and future litigants from hardships arising from insurer insolvency.

21. In a roundabout way, Appellant challenges the propriety of joint and several liability generally in this case. In particular, Appellant main-

> The Act requires every insurer, as a condition of doing business in the Commonwealth, to participate in the Association. In this manner, the risk of loss due to the insolvency of any one insurer is spread out over all member insurance companies and their policyholders. In effect, every time PPCIGA pays a claim, every member insurance company is paying part of the claim. Therefore, Section 991.1817 aims to lessen the financial burden on the insurance industry. . . .
> Thus, contrary to PPCIGA's position in this case, both the Act and interpretative caselaw evidences clear concern for the financial burden on insurance companies doing business in Pennsylvania.

*Carrozza,* 866 A.2d at 385 (citations, quotation marks, and added emphasis omitted). To require PPCIGA to bear the burden of its share of the judgment in this case, up to its statutory limits, is not inconsistent with this purpose. Carrozza is made whole, and the burden caused by one insurer's insolvency is spread across all Pennsylvania insurers, a result far more consistent with the purposes of the Act than would be the imposition of the entire weighty burden of this judgment on MIIX alone, notwithstanding that the trial court assessed its insured only half the liability for the injury to be remedied.

This is not to say that PPCIGA must bear the entire burden alone simply because Carrozza seeks to satisfy her judgment from PPCIGA as injured of a joint tortfeasor. In this regard, PPCIGA appears to be like any other tortfeasor's insurer. Thus, it may be as free to pursue contribution from MIIX (as joint tortfeasor's insured) as PHICO, had it remained solvent,

tains that the trial court's express apportionment of liability 50% / 50% across the two defendant physicians and their respective affiliated hospitals and insurers is irreconcilable with the joint and several nature of the judgment. Although joint and several liability requires an indivisible injury for which two or more parties are partially responsible, it is the indivisibility of the injury, rather than of culpability, that triggers joint liability. As noted by the Superior Court, apportionment of liability among joint tortfeasors not only is permissible and familiar, *see, e.g., Allen,* 567 Pa. 1, 784 A.2d 762, but indeed it is ultimately necessary in the event of a contribution action brought by one joint tortfeasor against another upon satisfaction of the judgment by the party seeking contribution.

would have been. *See* 42 Pa.C.S. § 8324; *e.g., Baker v. ACandS,* 562 Pa. 290, 755 A.2d 664 (2000).

Put simply, no legal authority urges the slash and burn approach to protecting PPCIGA's assets forwarded by PPCI-GA,[22] nor does any prior case say anything about the relationship between the Act and joint and several liability. To the contrary, on that topic precedent is as silent as the statute itself. Further, in *Bell,* where the Court was presented with the real prospect of a duplicative recovery, we protected PPCIGA's recourse to the non-duplication provision as consistent with the policy of the larger statute and the express concern protected by that provision. Here, however, PPCIGA does not have a legitimate duplication to bemoan; rather, it seeks to compel Carrozza to seek an alternative source of recovery so that it *thereafter* can point to a recovery that it need not duplicate. Neither the larger Act nor the non-duplication of recovery provision, in express or implied intent, appears to us to require such a move in derogation of the claimant's traditional prerogative to seek recovery in full from any one among two or more joint tortfeasors, leaving the burden of wrangling over proportionate responsibility to the wrongdoers (or their insurers). *See generally Baker,* 755 A.2d at 669–71.

Another concern also animates our ruling, one couched in the practical consequences that would follow a ruling in PPCI-GA's favor in this case. In addition to the reallocation in this case and in others like it of a disproportionate burden on a solvent insurance company, itself an eventuality that appears directly to contravene the purpose of the Act to the extent it

**22.** Indeed, our ruling in *Keystone Aerial Surveys,* 574 Pa. 147, 829 A.2d 297, which effectively increased PPCIGA's exposure in that case from $300,000 to $1,500,000, illustrates our ongoing commitment to read the Act consistently with its remedial purpose. In that case, we considered whether five family members seeking survival benefits for a lost relative each had a separate claim of up to $300,000 against PPCIGA in *lieu* of the insolvent insurer, or had only one claim shared for $300,000 among them that was derivative of the single claim the decedent putatively would have possessed had he survived to seek redress on his own behalf. Notwithstanding the additional burden placed on the Association, we concluded that each of five family members possessed a discrete "covered claim" for purposes of the Act.

aims to minimize the occurrence of insurer insolvency, an indirect reallocation also may occur. As Appellee MIIX notes, albeit with some degree of overstatement, "if the Association's position is accepted its liability . . ., as a practical matter, will be limited to those situations where there is a single defendant." Brief for MIIX at 20. That is to say, because multiple defendants increase substantially the likelihood that a judgment will be joint and several, in a multiple-defendant case, PPCIGA will be best advised, in protecting its coffers, to leave resolution of the case to any solvent insurers and the plaintiff, which in turn very likely will substantially increase the cost of settlement (not to mention trial and verdict, should the case go so far) for those solvent insurers whose policies are implicated in the case, and / or lead to a greater proportion of cases going to trial. Contrarily, under an appropriate reading of the law, pursuant to which PPCIGA may be liable jointly and severally for judgments against insureds for whom it takes responsibility, PPCIGA will have an incentive to participate in negotiations, thus encouraging settlement of claims.

 MIIX speculates more specifically on this topic, and does so in ways that would require us to look beyond the record before us. We need not do so, however, to recognize the simple truth of MIIX's general argument: that affirmatively providing PPCIGA an escape hatch, based merely on the presence of joint and several liability (something that is hardly uncommon in the medical malpractice and other relevant contexts), would materially reduce PPCIGA's incentive to participate in settlement negotiations, and in doing so will reduce the incentives of other parties—solvent insurers; the Medical Care Availability and Reduction of Error (MCARE) Fund—to negotiate in good faith.[23] Certainly, this circum-

23. The MCARE Fund, created by the MCARE Act, Act of Mar. 20, 2002, P.L. 154, No. 13, §§ 101, *et seq.*, 40 P.S. §§ 1301.101, *et seq.*, which replaced the predecessor Medical Professional Liability Catastrophe Loss Fund created by MCARE's predecessor Health Care Services Malpractice Act, Act of Oct. 15, 1975, P.L. 290, No. 111, §§ 101, *et seq.*, 40 P.S. §§ 1301.101, *et seq.* (repealed), provides statutory insurance coverage to Pennsylvania physicians from funds generated by surcharges levied against healthcare providers. The earlier Act's stated purpose was

stance would disserve the objectives that underlie the PPCI-GA Act, which include protecting individuals' claims from dissipation as a consequence of insurer insolvency, expediting the resolution of claims, and preventing insurer insolvency generally.

In light of the foregoing concerns, we must find the Act's silence with regard to the effect of the non-duplication of recovery provision in the context of joint and several liability dispositive when coupled to the express injunction that PPCI-GA assume the rights, burdens, and liabilities of an insolvent insurer for purposes of claims pending under the insolvent insurer's policies at the time of the insolvency. Accordingly, albeit for somewhat different reasons than those relied upon by the Superior Court, we affirm the court's ruling that Carrozza may seek recovery on her joint and several judg-

to make available professional liability insurance at a reasonable cost, and to establish a system through which a person who has sustained injury or death as a result of tort or breach of contract by a health service provider can obtain a prompt determination and adjudication of his claim and the determination of fair and reasonable compensation.

40 P.S. § 1301.102 (repealed); *see* 40 P.S. § 1303.102 (setting forth a similar policy for the MCARE Act).

Under the MCARE system, and identically under the predecessor system in general terms, healthcare providers are required to procure a statutorily defined level of primary insurance. For judgments in excess of the provider's primary insurance, up to a statutory limit, the MCARE Fund satisfies the judgment. Any amounts that exceed the sum of the primary coverage and the statutory coverage must either be covered by the provider directly or via an excess insurance policy. The monetary thresholds and rules pertaining to these three tiers of coverage vary year-by-year under MCARE, *see, e.g.,* 40 P.S. § 1303.711 (providing the parameters for the amount of primary coverage healthcare providers must procure), and are not directly at issue in this case.

The MCARE Fund has filed a brief as *Amicus Curiae* in this litigation arguing that we should reject PPCIGA's interpretation of the non-duplication provision precisely because the Fund believes that the disincentives to settlement such a ruling would create will burden the MCARE Fund and solvent insurers and in so doing will flout legislative intent by making Pennsylvania a more inhospitable environment for insurers and by slowing the process by which medical malpractice claims are resolved. The Pennsylvania Trial Lawyers Association and the Hospital & Healthsystem Association of Pennsylvania also have submitted *Amici* briefs arguing that this Court should uphold the Superior Court's ruling.

ment against Drs. Greenbaum and Evers in the first instance against PPCIGA in its capacity as surrogate for Dr. Evers's insolvent insurer. *See Craley v. State Farm Fire & Cas. Co.,* 586 Pa. 484, 895 A.2d 530, 532–33 (2006) (holding that this Court may affirm on any basis).

Order affirmed. Case remanded for further proceedings consistent with this Opinion.

Former Justice NEWMAN did not participate in the decision of this case.

Chief Justice CAPPY, Justice CASTILLE and EAKIN and Justice BALDWIN join the opinion.

Justice SAYLOR concurs in the result.